# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**BREWTON ENTERPRISES, INC. d/b/a
LONGLEAF LIGHTER**, 766 Industrial Park
Drive, Brewton, Alabama 36426, on behalf of
itself and all others similarly situated,

Plaintiff,

vs.

Civil Action No. _____

**AAA COOPER TRANSPORTATION;
ARKANSAS BEST CORPORATION; ABF
FREIGHT SYSTEMS, INC.; AVERITT
EXPRESS, INC.; CON-WAY FREIGHT, INC.;
ESTES EXPRESS LINES, INC.; FEDEX
CORPORATION; FEDEX FREIGHT
CORPORATION; FEDEX NATIONAL LTL,
INC.; JEVIC TRANSPORTATION, INC.;
OLD DOMINION FREIGHT LINE, INC.;
OVERNITE CORPORATION; ROADWAY
EXPRESS, INC.; R+L CARRIERS, INC.;
SAIA, INC.; SAIA MOTOR FREIGHT LINE,
LLC; SOUTHEASTERN FREIGHT LINES,
INC.; SUN CAPITAL PARTNERS IV, LLC;
UNITED PARCEL SERVICE, INC.;
WATKINS MOTOR LINES; YELLOW
TRANSPORTATION, INC.; YRC REGIONAL
TRANSPORTATION, INC.; and YRC
WORLDWIDE, INC.,**

CLASS ACTION COMPLAINT

DEMAND FOR JURY TRIAL

Defendants.

Plaintiff, Brewton Enterprises, Inc.., brings this action for damages and injunctive relief

for price fixing under Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. §1, and the

antitrust laws of the United States against all the national and the dominant regional trucking

freight carrier conglomerates named above, which are or were operating in the market known as

"less-than-truckload" or "LTL" freight transportation services in the United States between at

least June 15, 2003 and the present. Based upon personal knowledge, information and belief and the investigation of counsel, Plaintiff Brewton Enterprises, Inc. alleges as follows:

## NATURE OF THE ACTION

1.      This case arises out of conspiracy among defendants and their coconspirators to fix the prices of "fuel surcharges" applied to less-than-truckload freight shipments ("LTL").

2.      This case is brought as a class action on behalf of all persons who, from at least as early as June 15, 2003 to the present (hereinafter, the "Class Period"), purchased LTL freight transportation services and were assessed and paid a "fuel surcharge" directly to one or more of the defendants or their co-conspirators ("LTL Fuel Surcharges").

3.      During the Class Period, and possibly earlier, defendants conspired to fix, raise, maintain and/or stabilize prices of LTL Fuel Surcharges by the means and mechanisms described herein, which, by their character, their arbitrary nature and sheer volume of acts taken against the interest of each individual defendant, could only be the result of collusive conduct.

4.      As alleged herein, defendants agreed with each other to charge LTL Fuel Surcharges to customers; to compute and apply them in a common manner; to set and compute them as percentages of their customers' base freight rates using common indices so that any increases were not reflective of the actual fuel price increases; to use common trigger points in near lockstep fashion; to maintain near total uniformity of the percentages charged; to portray the surcharges to customers as necessary to recoup unexpected fuel cost increases when they were not; to use the surcharges instead as revenue generators; and to maintain an appearance of competing on LTL freight shipment rates, while using LTL Fuel Surcharges as revenue-enhancement measures shielded from normal competitive forces.

2

5.    Defendants' choice of a common index, common trigger points for adjustment, and a common methodology of percentages of base rates, enabling uniformity of charges and insuring that the LTL Fuel Surcharges would not correlate to any actual increase in the cost of fuel, are all evidence of the fact that defendants' LTL Fuel Surcharge programs were the result of concerted, rather than unilateral conduct.

6.    It was not in the unilateral economic self-interest of each defendant to agree on a common index, trigger points and methodology for LTL Fuel Surcharges or on the amount and timing of LTL Fuel Surcharges instead of seeking to increase its business and market share by implementing a different and lower LTL Fuel Surcharge or methodology than its competitors.

7.    Each of the acts described in paragraphs 4 and 5 above, both individually and taken in combination, constitute acts by each defendant against its own interest, as well as collusive conduct.  Each act resulted in inflated LTL Fuel Surcharges charged to its customers, in amounts greater than the actual cost of fuel increases, imposed on commodity services where purchasers made purchasing decisions based primarily, if not wholly, on price.  Had any defendant *not committed* any one or all of these acts, it would have resulted in increased market share, increased profits to the company and increased value to the shareholders – obtained by lawful means.

8.    As one industry analyst observed, "despite different LTL carriers having very different operational characteristics and economies, they invariably set nearly identical fuel surcharge levels."

9.    When defendant FedEx Freight finally announced a 25% reduction of its LTL Fuel Surcharges on July 23, 2007, Bear Stearns' analyst noted that the LTL Fuel Surcharge reduction was "the most overt sign of price competition in the LTL market since the mid 1990s."

10.    By 2005, defendants' concerted LTL Fuel Surcharge programs were enabling them to obtain record profits and profit margins. For example, Old Dominion achieved the highest profit margins in its 14 years as a public company.

11.    As a direct and proximate result of defendants' unlawful conduct and price-fixing conspiracy, plaintiff and the members of the Class (defined below) have paid unlawful, artificially high prices for LTL Fuel Surcharges, and thus unlawful, artificially high prices for LTL freight transportation services than they would have paid in a competitive market, and therefore, have suffered injury to their respective businesses and property.

12.    At all times relevant to this Complaint, plaintiff has been a direct purchaser of LTL Fuel Surcharges from one or more of the defendants. Plaintiff brings this class action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover damages, the costs of suit, including reasonable attorneys' fees, to enjoin the continuation of the conspiracy, and for such other relief as is afforded under the antitrust laws of the United States for defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1.

## PLAINTIFF

13.    Plaintiff Brewton Enterprises, Inc. d/b/a Longleaf Lighter ("Brewton Enterprises" or "Plaintiff") is an Alabama corporation with its principal place of business located at 766 Industrial Park Drive, Brewton, Alabama 36426. During the Class Period, Brewton Enterprises purchased LTL freight transportation services directly from one or more of the defendants and was assessed and paid LTL Fuel Surcharges in connection with the LTL freight transportation services.

14.    The prices Brewton Enterprises paid to defendants for LTL freight transportation services on which LTL Fuel Surcharges were imposed was greater than the prices Brewton

Enterprises would have paid absent the conspiracy alleged herein. Brewton Enterprises has therefore been injured in its business and property by reason of defendants' antitrust violations. Brewton Enterprises asserts its claims on behalf of itself and all direct purchasers who, during the Class Period, purchased from one or more of the defendants LTL freight transportation services which resulted in an imposition of LTL Fuel Surcharges.

## DEFENDANTS

### The YRC Defendants

15.    Defendant YRC Worldwide, Inc. ("YRC") (formerly named Yellow Corporation, Yellow Freight System, Inc. of Delaware and Yellow Roadway Corporation) is a Delaware corporation with its headquarters located at 10990 Roe Avenue, Overland Park, Kansas 66211-1213. The YRC group of companies is the largest LTL freight transportation services provider in the United States and one of the largest in the world. YRC operates in the LTL market through its wholly-owned operating subsidiaries Yellow Transportation, Inc., Roadway Express, Inc. and YRC Regional Transportation Inc. During the Class Period, YRC directly and/or through its control of its affiliates sold LTL freight transportation services throughout the United States. According to SJ Consulting Group, Inc, experts in the transportation and logistics industries, the YRC conglomerate of companies had annual revenues from its LTL businesses in excess of $8.4 billion in 2006.

16.    Defendant Yellow Transportation, Inc. is an Indiana corporation with its headquarters located at 10990 Roe Avenue, Overland Park, Kansas 66211 and additional offices located at 1 N. Capital Avenue and 36 S. Pennsylvania Street, Suite 70, Indianapolis, Indiana 46204. Yellow Transportation is the wholly owned subsidiary of defendant YRC Worldwide, Inc. During the Class Period, Yellow Transportation directly sold LTL freight transportation

5

services throughout the United States. In 2006, Yellow Transportation had annual revenues from its LTL business of over $3 billion.

17.    Defendant Roadway Express, Inc. is a Delaware corporation with its headquarters located at 10990 Roe Avenue, Overland Park, Kansas 66211. Roadway Express is a wholly owned subsidiary of defendant YRC. During the Class Period, Roadway Express directly sold LTL freight transportation services throughout the United States. In 2006, Roadway Express had annual revenues from its LTL business of over $3 billion.

18.    Defendant YRC Regional Transportation, Inc. is a Delaware corporation with its headquarters located at 10990 Roe Avenue, Overland Park, Kansas 66211. YRC Regional Transportation is a wholly-owned subsidiary of defendant YRC. During the Class Period, YRC Regional Transportation, commonly known as the "YRC Regionals," directly sold LTL freight transportation services throughout the United States. This YRC group had revenues in 2006 in excess of $2 billion.

**The FedEx Defendants**

19.    Defendant FedEx Corporation ("FedEx") is a Delaware corporation with its headquarters located at 942 South Shady Grove Road, Memphis, Tennessee 38120. FedEx is an internationally recognized company providing transportation, packaging, shipping, LTL freight transportation services, e-commerce and business solutions. The FedEx group of companies is believed to be the second largest provider of LTL freight transportation services in the United States. According to FedEx's website, its wholly-owned subsidiary FedEx Freight Corporation is a leading U.S. provider of regional next-day LTL service and had annual revenues of $4.5 billion in fiscal year 2007. In September 2006, FedEx purchased the LTL operations of defendant Watkins Motor Lines, bringing its total annual LTL revenue to over $5.4 billion.

During the Class Period, FedEx directly and/or through its control of its affiliates, including without limitation to its wholly-owned subsidiary FedEx Freight Corporation, FedEx National LTL and Watkins Motor Lines, sold LTL freight transportation services throughout the United States.

20.    Defendant FedEx Freight Corporation is a Delaware corporation with its headquarters located at 942 South Shady Grove Road, Memphis, Tennessee 38120. FedEx Freight Corporation is a wholly-owned subsidiary of defendant FedEx and provides (as alleged in the preceding paragraph) LTL freight transportation services throughout the United States. During the Class Period, FedEx Freight Corporation directly and/or through or under the control of its affiliates sold LTL freight transportation services throughout the United States.

21.    Defendants FedEx National LTL, Inc. is a Delaware corporation with its headquarters located at 1715 Aaron Brenner Drive, Suite 600, Memphis, Tennessee 38120. FedEx National LTL is a wholly owned subsidiary of defendant FedEx and known as its LTL division. Defendant Watkins Motor Lines was "rebranded" as FedEx National LTL after its purchase by FedEx in September 2006. During the Class Period, FedEx National LTL directly sold LTL freight transportation services throughout the United States.

22.    Defendant Watkins Motor Lines is a Florida corporation and was, during a significant portion of the Class Period, a private trucking company with its headquarters located in Lakeland, Florida. Watkins Motor Lines was purchased by FedEx in September 2006 for $780 million and is now a wholly owned subsidiary of defendant FedEx. In 2006, Watkins Motor Lines had revenues from its LTL business in excess of $1 billion. Subsequent to September 2006, Watkins Motor Lines was "rebranded" as defendant FedEx National LTL.

7

**Con-Way Freight**

23.    Defendant Con-Way Freight, Inc. is a Delaware corporation with its headquarters located at 10 Parkland Plaza, Ann Arbor, Michigan 48103. Con-Way Freight is a wholly-owned subsidiary of defendant Con-Way and provides LTL freight transportation services through its regional LTL motor carriers: Con-Way Freight Western, Con-Way Freight Central, and Con-Way Freight Southern. Con-Way is believed to be the third largest provider of LTL freight transportation services in the United States with annual revenues just under $3 billion. In 2006, Con-Way Freight's revenues were about $2.8 billion. During the Class Period, Con-Way Freight Inc. directly and/or through or under the control of its affiliates sold LTL freight transportation services throughout the United States.

**The UPS Defendants**

24.    Defendant United Parcel Service, Inc. ("UPS") is a Delaware corporation with its headquarters located at 55 Glenlake Parkway, NE, Atlanta Georgia 30328. UPS is an internationally-recognized freight, package delivery and supply chain management company. On or about August 5, 2005, UPS acquired Overnite Corporation for $1.25 billion and entered the LTL market. Upon information and belief, UPS assumed Overnite Corporation's liabilities. UPS is now believed to be the fourth largest LTL freight transportation service provider in the United States. In 2006, UPS "rebranded" Overnite Corporation as UPS Freight. UPS Freight's annual revenues for 2006 were in excess of $1.8 billion. According to the American Trucking Association, UPS Freight is now the fourth largest LTL provider. During the Class Period, UPS directly and/or through its control of its affiliates, including without limitation its UPS Freight business, sold LTL freight transportation services throughout the United States.

25.    Overnite Corporation is a Virginia corporation with its headquarters located at

1000 Semmes Avenue, Richmond, Virginia 23224. During a significant portion of the Class

Period, Overnite was independently operated. Overnite was the fourth largest LTL provider in

2005 with revenues in excess of $1.8 billion. As described above, Overnite is now owned by

defendant UPS and "rebranded" as UPS Freight. During the Class Period, Overnite directly sold

LTL freight transportation services throughout the United States.

**The Arkansas Best Defendants**

26.    Defendant Arkansas Best Corporation is a publicly-traded Delaware corporation

with its headquarters located at 3801 Old Greenwood Road, Fort Smith, Arkansas 72903.

Arkansas Best is trucking conglomerate offering LTL freight transportation services under a

variety of business names and wholly-owned alter-ego subsidiaries, including without limitation,

ABF Freight System, ABF Freight System Canada, ABF Cartage, Land-Marine Cargo and

FreightValue, Inc. The Arkansas Best group of companies are believed to be the fifth largest

provider of LTL freight transportation services in the United States. During the Class Period,

Arkansas Best Corporation directly and/or through its control of its affiliates, including without

limitation its wholly-owned subsidiary defendant ABF Freight Systems, Inc., sold LTL freight

transportation services throughout the United States.

27.    Defendant ABF Freight Systems, Inc. is a Delaware corporation with its

headquarters also located at 3801 Old Greenwood Road, Fort Smith, Arkansas 72903. ABF

Freight Systems is a wholly-owned subsidiary of defendant Arkansas Best Corporation and,

according to its website, "is one of North America's largest LTL carriers of general

commodities." ABF Freight Systems services all 50 states and in 2006, its revenues exceeded

$1.8 billion. During the Class Period, ABF Freight Systems directly sold LTL freight transportation services throughout the United States.

**Estes Express**

28.    Defendant Estes Express Lines, Inc. is a privately held Virginia corporation with its headquarters located at 3901 West Broad Street, Richmond, Virginia 23230. Estes Express Lines is believed to be the sixth largest LTL freight transportation service provider in the United States with revenues in 2006 exceeding $1.4 billion. Estes Express Lines operates 185 terminals and a fleet of over 29,000 tractors and trailers. During the Class Period, Estes Express Lines directly sold LTL freight transportation services throughout the United States.

**Old Dominion**

29.    Defendant Old Dominion Freight Line, Inc. ("Old Dominion") is publicly-traded Virginia corporation with its headquarters located at 500 Old Dominion Way, Thomasville, North Carolina 27360. Old Dominion is believed to be the seventh largest LTL freight transportation service provider in the United States with revenues in 2006 exceeding $1.1 billion and as described by its website "a leading national less-than-truckload (LTL) carrier providing direct service to 47 states." Old Dominion operates over 4,600 tractors, 13,000 trailers and 188 service centers. During the Class Period, Old Dominion directly sold LTL freight transportation services throughout the United States.

**The SAIA Defendants**

30.    Defendant Saia, Inc. ("Saia") (formerly known as SCS Transportation, Inc.) is a publicly-traded Delaware corporation with its headquarters located at 11465 Johns Creek Parkway, Suite 400, Duluth, Georgia 30097. Saia provides LTL freight transportation services to about 34 states and operating 148 terminals through its wholly-owned operating subsidiary

10

Sais Motor Freight Line, LLC. The Saia group of companies is believed to be the eighth largest LTL freight transportation service provider in the United States. According to its website, Saia is a top ten LTL company having achieved most of its growth through mergers and acquisitions. Previously, Saia had been a wholly-owned subsidiary of Yellow Corporation (now known as defendant YRC Worldwide) and became an independent public company on September 30, 2002. On or about June 30, 2006, Saia completed the sale of defendant Jevic Transportation, Inc. to a private investment firm, defendant Sun Capital Partners IV, LLC. During the Class Period, Saia directly and/or through its control of its affiliates, including without limitation its wholly-owned subsidiary Saia Motor Freight Line, LLC, sold LTL freight transportation services throughout about 30 states of the United States in the West, Midwest, Southeast and Southwest regions of the United States.

31.     Defendant Saia Motor Freight Line, LLC is a wholly-owned subsidiary of Defendant Saia, with its headquarters located at 11465 Johns Creek Parkway, Suite 400, Duluth, Georgia 30097. In 2006, Defendant Saia Motor Freight, LLC reported annual revenues of $874.7 million of which $102.5 million was attributable to the LTL Fuel Surcharges. During the Class Period, defendant Saia Motor Freight Line, LLC directly and/or under the control of its affiliates, including without limitation Defendant Saia, sold LTL freight transportation services throughout a majority of the United States.

32.     Defendants Jevic Transportation, Inc. ("Jevic") is a New Jersey corporation with its headquarters located at 600-700 Creed Road, Delanco, New Jersey 08075. Jevic is a major regional LTL carrier operating in the Northeastern United States, and a hybrid LTL and truckload carrier. Jevic's fleet consists of about 1,400 tractors and 2,400 trailers. Its 2005 revenues were about $350 million. Prior to June 2006, Jevic was owned by defendant SAIA,

Inc. Jevic was sold by Saia to a private investment firm, defendant Sun Capital Partners IV, LLC. During the Class Period, Jevic directly and/or through its control of its affiliates sold LTL freight transportation services in the Northeastern United States.

33.    Sun Capital Partners IV, LLC is a private equity fund and Delaware limited liability company, with its headquarters located at 5200 Town Center Circle, Suite 470, Boca Raton, Florida 33486. Sun Capital Partners purchased defendant Jervic in or about June of 2006. During the Class Period, Sun Capital Partners directly and/or through its control of its affiliate Jervic sold LTL freight transportation services in the Northeastern United States.

**Other Dominant National and Regional LTL Carrier Defendants**

34.    Defendant Averitt Express ("Averitt") is a privately-held Tennessee corporation with its headquarters located at Perimeter Place One, 1415 Neal Street, Cookeville, Tennessee 38502. Averitt provides LTL freight transportation services in about 18 states in the Southeast, parts of the Southwest, Midwest regions of the United States and through partnerships elsewhere in North America. Averitt operates a fleet of approximately 4,000 tractors and 11,250 trailers from a network of about 80 terminals. Averitt's 2006 and 2007 revenues are estimated to be over $800 million. During the Class Period, Averitt directly sold LTL freight transportation services throughout the United States.

35.    Defendant R+L Carriers, Inc. ("R+L") is a privately-held Ohio corporation with its headquarters located at 600 Gilliam Road, Wilmington, Ohio 45177. R+L is a LTL company, servicing 43 states, operating a fleet of more than 13,000 tractors and trailers, with annual revenues in 2005 and 2006 of almost $800 million. R+L operates under its own name and under the names R+L Transfer, Gator Freightways, Greenwood Motor Lines, and Paramount

Transportation. During the Class Period, R+L directly and/or through its control of its affiliates sold LTL freight transportation services in 43 states throughout the United States.

36.     Southeastern Freight Lines, Inc. is a South Carolina corporation with its headquarters located at 420 Davega Road, Lexington, South Carolina 29073. Southeastern Freight Lines is a major regional LTL freight transportation service provider operating in 12 states in the Southeast and parts of the Southwest, with revenues in 2006 exceeded $700 million. During the Class Period, Southeastern Freight Lines directly sold LTL freight transportation services in the Southeastern and Southwestern regions of the United States.

37.     AAA Cooper Transportation, Inc. is an Alabama corporation with its headquarters located at 1751 Kinsey Road, Dothan, Alabama. AAA Cooper Transportation is a major regional LTL freight transportation service provider operating in 15 states in the Southeast and parts of the Southwest, with revenues in 2005 and 2006 in excess of $500 million. During the Class Period, AAA Cooper Transportation directly sold LTL freight transportation services in the Southeastern and Southwestern regions of the United States.

## CO-CONSPIRATORS AND AGENTS

38.     Other natural persons, corporations, and entities not named as defendants herein, have participated in the unlawful conspiratorial activity alleged herein in violation of the antitrust laws of the United States.

39.     Whenever in this Complaint reference is made to a statement, or transaction of any corporation or entity, the allegation means that the corporation or entity acted, stated, or transacted by or through its directors, members, partners, officers, employees, or agents, while they were engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within the scope of their authority.

## JURISDICTION AND VENUE

40.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1337 and 15 U.S.C. §§15, 26.

41.    Venue is proper in this district pursuant to 28 U.S.C. §§15, 22 and 26 and pursuant to 28 U.S.C. §1391(b), (c) and (d), because at all times relevant to the Complaint, (a) defendants transacted business, were found, or acted through subsidiaries or agents present in this district; (b) a substantial part of plaintiff's claims occurred in this district; (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

42.    This Court has *in personam* jurisdiction over each of the defendants because, *inter alia*, each of the defendants: (a) committed acts in furtherance of the conspiracy alleged herein in this district and directed the unlawful conspiracy through persons and entities located in this district, including fixing the prices of LTL sold to purchasers in this district; (b) transacted business in LTL and other products in this district; (c) maintain and have maintained continuous and systemic contacts with this district over a period of years; (d) purposefully availed itself of the benefits of doing business in this district. Accordingly, each of the defendants maintains minimum contacts with this district more than sufficient to subject it to service of process and sufficient to comply with due process of law.

## FACTUAL ALLEGATIONS

### The LTC Fuel Surcharge Conspiracy

43.    Fuel cost is the single substantial variable defendants must cover that is subject to wide variation in price. When a company's variable costs increase, without a concomitant

offsetting increase in demand, the profits of the company will decrease because the company can only pass on a portion of the cost increase to its customers.

44.     Defendants, facing increased fuel costs and the likelihood of lower profits, have evaded this basic economic law by collusively imposing on their customers what are claimed to be "fuel surcharges," but which in fact bear little relation to the increase in their fuel costs.

45.     Higher fuel costs in fact were merely the pretext and an opportunity for defendants to agree among themselves to impose collusive "fuel surcharges" as a revenue generator.

46.     Fuel surcharges in the LTL industry were instituted in the early to mid 1990s. They initially were met with limited success. Significantly, the fuel surcharges imposed in the early period, unlike those imposed during the conspiracy period, *varied significantly from carrier to carrier*.

47.     The early surcharges were not stated as a percentage of the cost of the base freight, and the carriers were not successful in having them distinguished from base freight rates.

48.     As described in greater detail below, in the earlier years, the industry was not as concentrated as it became by 2003 as the result of mergers of major LTL carriers, as well as the bankruptcy of many smaller LTL providers.

49.     By 2003, the LTL industry had consolidated to the point where collusion on LTL Fuel Surcharges became possible and had become the leading, major means to boost revenue by a process that was shielded from competition.

50.     As one industry analyst, Donald Broughton of A.G. Edwards & Sons, put it, in the early days of unsuccessful fuel surcharges, shippers could "route around those guys [those with

the fuel surcharges] and find one who didn't have surcharges. But all those carriers who didn't ask for fuel surcharges in the early 1990s are gone."

51.    By January 2003, industry analysts noted that LTL Fuel Surcharges that had failed for 10 years were suddenly successfully imposed by the carriers.

52.    A 2006 article in *Traffic World*, a weekly trade publication covering the transportation and logistics industry, quoted Ken Hazen, president of transportation software and freight payment firm CTSI, as describing fuel surcharges as "a profit center now . . . . Carriers are in control. They're in the catbird seat."

53.    Defendants had been largely unsuccessful in unilaterally implementing LTL Fuel Surcharges between the early 1990s and 2002 when there was competition among LTL carriers, however, suddenly in 2003 there was unity and successful implementation.

54.    This sudden "unity" could only have been the result of collusion.

55.    In 2003, defendants departed from their normal business practice of incorporating fuel costs increases into their basic linehaul costs and began to charge identical or nearly identical percentages of the base freight rates.

56.    Whereas in the early years of LTL Fuel Surcharges varied significantly from carrier to carrier, suddenly in 2003 the variations ceased. There could be no explanation for this change, but collusion and agreement among carriers.

57.    Beginning in 2003, defendants agreed with each other to impose in an identical manner separate LTL Fuel Surcharges on the invoices submitted to their shipping customers throughout the United States, rather than incorporate increases in the costs of fuel in the base freight rates.

58.     Defendants agreed with each other to compute LTL Fuel Surcharges in an identical manner as a percentage of their customers' base rates, which would not correlate to any actual increase in the cost of the fuel, regardless of the likely variation in the costs that each carrier actually paid for fuel and the long-recognized "very different operational characteristics and economics" of each carrier.

59.     There was no legitimate business justification for this arbitrary means of assessing LTL Fuel Surcharges by percentages unrelated to the actual cost of fuel, other than to enable defendants to match the LTL Fuel Surcharges assessed on the customers of the other carriers and achieve uniformity.

60.     Defendants agreed with each other to use common indices, common timing and common trigger points for adjusting the percentages which constituted the LTL Fuel Surcharges, regardless of the likely variation in the costs that each carrier actually paid for fuel and the long-recognized "very different operational characteristics and economics" of each carrier.

61.     Defendants agreed to impose identical or nearly identical LTL Fuel Surcharges by agreeing to tie the LTL Fuel Surcharges to an index of diesel fuel prices published to the public by the United States Department of Energy ("Fuel Index").

62.     Defendants agreed with each other to portray the LTL Fuel Surcharges to their shipping customers as necessary to recoup unexpected fuel cost increases.

63.     Defendants agreed with each other to employ LTL Fuel Surcharges as revenue generators and profit centers, and not as a cost-recoupment measure, setting the LTL Fuel Surcharges percentages at levels that resulted in revenues far exceeding the actual cost of fuel increases.

17

64.     Defendants agreed with each other to set the level of LTL Fuel Surcharges at nearly identical percentages of their base freight rates, regardless of the likely variation in the costs that each carrier actually paid for fuel and the long-recognized "very different operational characteristics and economics" of each carrier. This action prevented customers from switching carriers in order to avoid the unlawful overcharges on LTL Fuel Surcharges and to pay lower LTL freight transportation costs to another carrier.

65.     Defendants agreed with each other to raise the LTL Fuel Surcharge percentages charged to customers in near lockstep, increasing the percentages charged in lockstep as the price of diesel fuel increased as reported in the U.S. Department of Energy Fuel Index ("Fuel Index"), regardless of the likely variation in the costs that each carrier actually paid for fuel and the long-recognized "very different operational characteristics and economics" of each carrier. This practice prevented customers from switching carriers in order to avoid the unlawful overcharges on LTL Fuel Surcharges and to pay lower LTL freight transportation costs to another carrier.

66.     Defendants agreed with each other to publish their individual LTL Fuel Surcharges on their websites on the internet, serving no apparent purpose for their businesses other than to enable defendants to monitor and enforce the unlawful agreements.

67.     The forbearance of all defendants from charging less than the uniform, inflated LTL Fuel Surcharge in order to gain a competitive advantage and larger share of the market, could only be explained by an agreement to charge identical or nearly identical rates.

68.     As a result of defendants' agreements, defendants' LTL Fuel Surcharges move in virtual lockstep, as illustrated in the following chart showing the fuel surcharges of the major defendants at different Fuel Index levels:

| Diesel Fuel $/gal. | Arkan Best | Averitt | Con-Way | FedEx Freight | Jevic | Old Domin. | R+L | Saia | UPS | YRC |
|---|---|---|---|---|---|---|---|---|---|---|
| 1.80 | 8.9% | 8.9% | 9.0% | 8.9% | 8.9% | 8.5% | 8.9% | 8.9% | 8.9% | 8.9% |
| 2.00 | 10.9% | 10.8% | 10.9% | 10.9% | 10.9% | 10.5% | 10.9% | 10.9% | 10.9% | 10.9% |
| 2.20 | 12.9% | 12.9% | 12.9% | 12.9% | 13.0% | 12.5% | 12.9% | 12.9% | 12.9% | 12.9% |
| 2.40 | 14.9% | 14.9% | 14.9% | 14.9% | 15.0% | 14.5% | 14.9% | 14.9% | 14.9% | 14.9% |
| 2.60 | 16.9% | 16.9% | 16.9% | 16.9% | 17.0% | 16.5% | 16.9% | 16.9% | 16.9% | 16.9% |
| 2.80 | 18.9% | 18.9% | 18.9% | 18.9% | 19.0% | 18.5% | 18.9% | 18.9% | 18.9% | 18.9% |
| 3.00 | 20.9% | 20.9% | 20.9% | 20.9% | 21.0% | 20.5% | 20.9% | 20.9% | 20.9% | 20.9% |
| 3.20 | 22.9% | 22.9% | 22.9% | 21.9% | 23.0% | 22.5% | 21.9% | 22.9% | 22.9% | 22.9% |
| 3.40 | 24.9% | 24.9% | 24.9% | 22.9% | 25.0% | 24.5% | 22.9% | 24.9% | 24.9% | 24.9% |
| 3.60 | 26.9% | 26.9% | 26.9% | 23.9% | 27.0% | 26.5% | 23.9% | 26.9% | 26.9% | 26.9% |

69.    Recently the Fuel Index was near $3.00. At that price, defendants charged a "fuel surcharge" of 20.5%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, and 21.0%.

70.    The amount of the LTL Fuel Surcharges imposed by the defendants on shipping orders exceeds the entire cost of fuel for delivering the freight of most customers, and vastly exceeds the actual cost or cost increase of the fuel.

### LTL Fuel Surcharges Are Profit Centers

71.    Observers of the LTL industry, and indeed some of the defendants themselves, have noted the direct relationship between high fuel prices and LTL profits.

72.    A transportation industry analyst at Bear Sterns noted that "Our sense is that generally the LTL carriers make money on fuel surcharges and that earnings for LTL providers would be hurt by sustained lower fuel costs."

73.    A 2005 article in *Fleet Owner*, a trade magazine for executives and managers of commercial trucking fleets, noted that in the past increased fuel prices were harmful to the LTL industry, but had become profitable during the recent period of increased prices:

> High diesel fuel prices usually signal harsh times for trucking.. . .
> That doesn't' seem to be the case this year.

74.    Defendant Old Dominion frankly admitted in its 2006 annual report that higher fuel prices increase its profitability, and lower fuel prices decrease its profitability:

> A rapid and significant decrease in diesel fuel prices would likely reduce our revenue and operating income until we revised our pricing strategy to reflect these changes.

75.    Defendant YRC also made this admission:

> In general, under our present fuel surcharge program, we believe rising fuel costs are beneficial to us in the short term.

76.    The Arkansas Best defendants also made this admission:

> As diesel fuel prices decline, the fuel surcharges and associated direct diesel fuel costs also decline by different degrees. Depending upon the rates of these declines and the impact on costs in other fuel and energy-related areas, operating margins could be negatively impacted.

77.    The SAIA defendants also made this admission:

> While fuel costs increased during 2006, higher fuel surcharges have more than offset higher diesel costs.

78.    In sum, defendants' imposition of the LTL Fuel Surcharges is not explained as independent rational decisions to pass on the same rising costs of fuel. Rather, the fuel surcharges imposed by all defendants are the result of collusive conduct.

## The LTL Market

79.    The "for hire" segment of the trucking industry is composed of "truckload" or "TL" shipping and "less-than-truckload" or "LTL" shipping. However, the two segments are vastly different industries. There are approximately 53,000 TL firms in the "TL" freight transportation market, however, there are less than 1,000 total firms in the LTL freight transportation market, with the vast majority of those being small companies which could not begin to meet the needs of the major, national industries dependent on the LTL carrier industry.

80.     Plaintiff and the many thousands of members of the Class purchase LTL freight transportation services as a means to transport freight within the United States by ground. Based on articles in trucking industry trade journals, plaintiff estimates the annual domestic LTL industry revenue to have ranged from $25 to $45 billion during the Class Period.

81.     In 2006, the total LTL market was estimated at $33.7 billion. Defendants controlled approximately $25.5 billion of that revenue, or 76% of the LTL market in 2006.

82.     The twelve interrelated defendant groups alleged here to be participants in the conspiracy are all of the national LTL carriers, plus several additional dominant regional carriers, which combined control approximately 76% of the LTL freight transportation market.

### Industry Meetings

83.     Representatives of defendants have regularly met through such organizations as American Trucking Associations, Inc. and the National Motor Freight Traffic Association, Inc. and in addition to the National Classification Committee and the regional "rate bureaus" described below.

84.     Defendants' agreements may have been reached at industry meetings held under the auspices of the National Motor Freight Traffic Association, Inc. ("NMFTA"), based in Alexandria, Virginia, the parent of the National Classification Committee. The NMFTA is a nonprofit membership organization comprised of more than 1,100 LTL motor carriers. The following defendants are currently listed as members of the NMFTA on its website: AAA Cooper, ABF Freight System, Inc., Averitt Express, Con-Way, Estes Express Lines, FedEx Freight, FedEx National LTL, Old Dominion Freight Lines, Roadway Express, UPS Freight and Yellow Transportation, Inc.

85.    The American Trucking Associations, Inc., with a staff of 200, is "the national voice for the trucking industry before Capitol Hill, regulators, the courts and the media" is headquartered in Arlington, Virginia with its "Capital Hill" offices located in Washington, DC. Currently, the Treasurer of the American Trucking Association is the Vice President, Domestic/International of United Parcel Service, Inc. based in Washington, DC and the Secretary is the Chairman, President and CEO of Yellow Roadway Corporation.

### The Conspiracy Was Made Possible By Massive Consolidation

86.    The LTL industry has become increasingly concentrated. For example, in 2003, defendant YRC, then operating under the name of Yellow, merged with Roadway, then one of its largest LTL competitors. The combined Yellow/Roadway entity then merged in 2005 with USF, further increasing LTL market concentration.

87.    Following the deregulation of the trucking industry by the Motor Carrier Act of 1980, the following LTL carrier companies and LTL operations of the companies either filed for bankruptcy or were shutdown in the last three decades:

*1980s*

| Company | Location | Year Ceased Operations |
|---|---|---|
| Admiral-Merchants Motor Freight Inc. | St. Paul MN | early 1980s |
| American Freight System | Overland Park KS | 1988 |
| Bender & Loudon Motor Freight | Akron OH | 1989 |
| Blue Line Express | Nashua NH | 1989 |
| Boss-Linco Lines Inc. | Buffalo NY | 1982 |
| Branch Motor Express | New York NY | 1984 |
| Brigg's Transportation | St. Paul MN | 1984 |
| Brown Express Inc | San Antonio, TX | 1988 |
| Campbell's 66 Express Inc | Springfield MO | 1986 |
| Central Transport | Sterling Heights MI | 1983 |
| Central Truck Lines Inc. | Tampa FL | 1989 |
| Chippewa Motor Freight Inc. | Eau Claire WI | 1980 |
| Clairmont Transfer Co. | Escanaba MI | 1985 |
| Cleveland, Columbus, & Cincinnati Highway Inc. | Cleveland OH | 1988 |

| Company | Location | Year Ceased Operations |
|---|---|---|
| Commercial-Lovelace Motor Freight | Columbus OH | 1985 |
| Cooper-Jarrett Motor Freight Lines Inc. | Orange NJ | 1981 |
| C.W. Transport Inc. | Wisconsin Rapids WI | 1988 |
| Davidson Transfer & Storage Co. | Baltimore, MD | 1983 |
| Eazor Express | Pittsburgh PA | 1983 |
| Gateway Transportation | La Crosse WI | 1983 |
| Glendenning Motorways Inc. | St. Paul MN | 1983 |
| Gordon's Transports Inc | Memphis TN | 1983 |
| Gross Common Carriers | unknown | late 1980s |
| Hall's Motor Transit Co. | Harrisburg PA | 1986 |
| Hannibal-Quincy Truck Lines Inc. | Quincy IL | 1983 |
| Hemingway Transportation | New Bedford MA | 1982 |
| Holmes Route USA | Framingham MA | 1989 |
| Horn's Motor Express Inc. | Chambersburg PA | 1989 |
| Illinois-California Express (ICX) | Denver CO | 1984 |
| IML Freight Inc | Salt Lake City UT | 1984 |
| Intercity Transportation | Easton MA | 1980 |
| Interstate Motor Freight System | Grand Rapids MI | 1984 |
| Johnson Motor Lines | Charlotte NC | 1980 |
| Jones Motor Co Inc | Spring City PA | 1981 |
| Lee Way Motor Freight Inc. | Oklahoma City OK | 1985 |
| Maislin Brothers Transport Ltd. | La Salle, Quebec | 1983 |
| Mason & Dixon Lines Inc | Kingsport TN | 1984 |
| McLean Trucking Co. | Winston-Salem NC | 1986 |
| Milne Truck Lines Inc | Salt Lake City UT | 1987 |
| Motor Freight Express System | York PA | 1982 |
| Murphy Motor Freight Lines Inc. | St. Paul MN | 1987 |
| Mushroom Transportation | Philadelphia PA | 1986 |
| Oneida Motor Freight Inc. | Carlstadt NJ | 1985 |
| Pilot Freight Carriers Inc. | Winston-Salem NC | 1989 |
| Quinn Freight Lines | Brocton MA | 1983 |
| Richmond Cartage Inc. | unknown | 1983 |
| Rimes Trucking Co. | Chardon OH | early80s |
| Ringsby Truck Lines Inc. | Denver CO | 1984 |
| Smith's Transfer Corp. | Staunton VA | 1988 |
| Spector-Red Ball | Dallas TX | 1982 |
| Sterling Transit Company Inc. | Montebello CA | 1989 |
| Suburban Motor Freight Inc. | Columbus OH | 1987 |
| System 99 | Oakland CA | 1987 |
| Taynton's Freight System Inc. | Wellsboro PA | 1985 |
| T.I.M.E.-D.C. Inc. | Lubbock TX | 1988 |
| Tose-Fowler Inc. | Bridgeport PA | 1989 |

| Company | Location | Year Ceased Operations |
|---|---|---|
| Transport Motor Express Inc. | Ft. Wayne IN | 1980 |
| Tucker Freight Lines | South Bend IN | 1983 |
| Wilson Freight Co. | Cincinnati OH | 1980 |

### *1990s*

| Company | Location | Year Ceased Operations |
|---|---|---|
| AAA | Trenton NJ | 1990 |
| Allegheny Freight Lines | Winchester VA | 1990 |
| ANR Advance Transportation Co. | Milwaukee WI | 1998 |
| Arrow Carrier Corp | North Bergen NJ | 1990 |
| Atlanta Motor Lines | Conley GA | 1997 |
| Bee Line Motor Freight Co. | Omaha NE | 1996 |
| Be-Mac Transport Co | St. Louis MO | 1992 |
| Birmingham Nashville Express | unknown | 1996 |
| Bowman Transportation | Gadsden AL/Atlanta GA | 1990 |
| Brown Transport Corp. | Atlanta GA/Charlotte NC | 1990 |
| Central Storage & Transfer Co. | Harrisburg PA | 1991 |
| Charlton Brothers | Hagerstown MD | 1996 |
| Churchill Truck Lines Inc | Chillicothe MO | 1994 |
| Coles Express Inc. | Bangor ME | 1997 |
| Commercial Motor Freight Inc. of IN | Indianapolis IN | 1983 |
| Edson Express | Casper WY/Denver CO | 1991 |
| Fore-Way Express Inc. | Wausau WI | 1996 |
| Friedman's Express | Wilkes-Barre PA | 1993 |
| Holmes Freight Lines | Omaha NE | 1998 |
| Hover Trucking Co. | South Bend IN | 1996 |
| Hyman Freightways Inc. | St. Paul MN | 1997 |
| Ideal Truck Lines | Norton KS | 1996 |
| Inter-City Truck Lines | Mississauga, Ontario | 1993 |
| Interlink Freight Systems | Toronto, Ontario | 1997 |
| Jones Truck Lines Inc. | Springdale AR | 1991 |
| Merchants Fast Motor Lines Inc | Abilene TX | 1997 |
| Middlewest Freightways Inc. | St. Louis MO | 1992 |
| Motorways Ltd | Toronto, Ontario | 1993 |
| Nationsway Transport Services | Commerce City CO | 1999 |
| North Penn Transfer | Lansdale PA | 1992 |
| Penn Yan Express | Penn Yan NY | 1990 |
| P.I.E. Nationwide Inc | Jacksonville FL | 1990 |
| Preston Trucking Inc. | Preston MD | 1999 |
| Spartan Express Inc. | Greer SC | 1997 |
| Standard Trucking Co. | Charlotte NC | 1993 |
| St. Johnsbury Trucking Co Inc. | St. Johnsbury VT | 1993 |
| Transcon Lines | Los Angeles CA | 1990 |

| Company | Location | Year Ceased Operations |
|---|---|---|
| Riss & Co. Inc | Kansas City MO | 1990 |
| Willig Freight Lines | San Francisco CA | 1995 |

### *2000s*

| Company | Location | Year Ceased Operations |
|---|---|---|
| A-P-A Transport Corp | North Bergen NJ | 2002 |
| Alterman Transport Lines | Opa-Locka, FL | 2003 |
| Consolidated Freightways Corp. | Vancouver WA | 2002 |
| Crescent Truck Lines | Haywood CA | 2003 |
| Crouse Cartage Co. | Carroll IA | 2000 |
| Guaranteed Overnite Delivery | unknown | 2004 |
| H&W Motor Express | Dubuque IA | 2002 |
| K&R Express Systems | Blue Ridge IL | 2004 |
| Nussbaum Trucking | Normal IL | 2002 |
| Parker Motor Freight | Grand Rapids MI | 2004 |
| Rudolf Express | Bourbonnais IL | 2002 |
| USF Red Star | Newark NJ | 2004 |

88.    Of the 60 leading LTL industry participants in operation in 1983, very few were left by 2003 and just six were left in 2006.

### **Other Structural Characteristics of the Industry**

89.    A number of structural characteristics of the LTL industry facilitate the implementation and maintenance of the horizontal price-fixing conspiracy alleged herein.

a    LTL freight transportation is a commodity service. One defendants' LTL freight transportation service is substitutable for another's. Defendants sell and plaintiff (and members of the Class) purchases LTL freight transportation services primarily on the basis of price.

b    Demand for LTL freight transportation services is inelastic. Accordingly, the gains from collusion are substantial.

c    The LTL industry in the United States is highly concentrated, facilitating coordination of prices. During the Class Period, defendants' combined United States market share exceeded 75%.

25

d    There are substantial barriers to entry in the LTL industry requiring substantial time, resources and industry knowledge to even potentially overcome. Viable entry requires the purchase or lease of hundreds of trucks and dozens of truck depots or terminals. Similarly, viable entry requires that a new provider capture a significant market share from existing providers. Thus, entry is both expensive and risky. Entry is further restricted by the tight labor market for truck drivers.

e    Even for potential shipping experts who possess the capital and know how to possibly enter the market, viable entry takes a long time. When package shipping leaders FedEx and UPS decided to enter the LTL market, they purchased and rebranded existing LTL companies rather than attempting to enter the market directly.

f    LTL freight transportation is a nondurable service. Unlike some industries, shippers cannot "stock up" on LTL freight shipments when prices are low and use this stockpile when shipping prices are high.

g    Defendants all sell at the retail level of distribution as horizontal competitors.

h    Price is the most important competitive factor in LTL shipping, and the standardized nature of the LTL shipping services hinders substantial and material non-price competition.

i    Newer industries are typically characterized by rapid growth, innovation, and high profits. The LTL industry is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

j    The industry has a history of "cooperation." For example, several regional LTL companies have formed alliances with other regional LTL companies, under the claimed

purpose of allowing nationwide service, but in fact with many more companies than would be required to offer such services. The level of cooperation within the trucking industry is conducive to the type of unlawful collusion alleged herein.

k      Defendants' publication of prices facilitated monitoring against cheating on the unlawful agreement to impose supra-competitive LTL Fuel Surcharges.

### The Collusive Use and Setting of LTL Fuel Surcharges Alleged Here Was Not Approved by the STB or Immunized from the Antitrust Laws

90.      Between 1933 and 1980, the motor carrier industry was subject to pervasive regulation. In 1948, Congress passed the Reed-Bullwinkle Act (Pub. L. No. 80-662, 62 Stat. 472) (1948) which allowed rate-bureaus operating under the Interstate Commerce Commission-approved agreements to set rates collectively, and immunized the activities of bureaus operating under such an agreement.

91.      The first phase of deregulation occurred in 1980 when Congress passed the 1980 Motor Carrier Act (Pub. L. No. 96-296, 94 Stat. 293 (1980) in which Congress essentially repealed interstate motor carrier regulation in order to promote competition. The interstate highway system had been built and trucks, rather than railroads, came to dominate the carriage of manufacturer goods. The motor carrier industry achieved financial stability and the original rationale for restrictive motor carrier regulation ceased to exist. The Act curtailed the permissible activities of rate bureaus and prohibited the bureaus or their members from interfering with any carrier's right to publish its own rates.

92.      The motor carrier industry was further deregulated in 1994 by the Trucking Industry Regulatory Reform Act (Pub. L. No. 103-311, 108 Stat. 1583 (1994), when Congress removed the requirement that motor carriers of general freight file tariffs.

93.    In 1995, the ICC Termination Act of 1995 (Pub. L. No. 104-88, 109 Stat. 803 (1995) eliminated regulation of motor carrier rates altogether, except for rates for household goods and certain rates collectively set by the motor carrier rate bureaus, and which were subject to review and approval by the Surface Transportation Board ("STB").

94.    Every five years the STB completes its review, pursuant to 49 U.S.C. 13703(c), of the agreements of motor carriers rate bureaus to engage in rate-related collective activities.

95.    After the 1995 deregulation, the rate bureaus, including the National Classification Committee and the regional rate bureaus – the Middlewest Motor Freight Bureau, the Rocky Mountain Tariff Bureau, the Southern Motor Carriers Rate Conference, Inc. and the New England Motor Rate Bureau – continued to exist. The bureaus established "class rates" based on a classification system and computed general rate increases.

96.    The activities of the STB-approved rate bureaus to set class rates and compute general rate increases have had limited immunity from the antitrust laws. However, notwithstanding this limited immunity, even motor carriers participating in the motor carrier rate bureaus have not had immunity to agree on the actual rates they will charge.

97.    The limited immunity given, until recently to the National Classification Committee and the regional rate bureaus, did not and does not apply to the conduct challenged in this case.

98.    Following the passage of the ICC Termination Act of 1995, "class rates" have been used only as "benchmarks" or "baseline prices." *See* Surface Transportation Board Decision, STB Ex Parte No. 656 "Motor Carrier Bureaus – Periodic Review Proceeding" and "Investigation into the Practices of the National Classification System," decided May 4, 2007 and service date May 7, 2007 ("STB Decision") attached as Exhibit A at 16.

28

99.    The motor carriers participating in the motor carrier rate bureaus have not had immunity to agree on the actual rates they will charge.  Title 49 U.S.C. Subtitle IV Part B Chapter 137 and 147 governs trucking today and 49 U.S.C. § 13703(a)(1)(G) provides that "rate adjustments of general application based on industry average carrier costs (so long as there is no discussion of individual markets or particular single-line rates)…"

100.    The National Motor Freight Traffic Association, Inc., headquartered in Alexandria, Virginia is a nonprofit membership organization comprised of more than 1,100 LTL motor carriers which develops and maintains the National Motor Freight Classification. Although the association describes the classification as a "pricing tool," its website states that "[c]lassification is not ratemaking and does not set freight charges."

101.    The carriers, especially the large carriers, set their rates individually according to their own costs and market conditions and publish their own rates.  The carriers that do continue to use a class rate system usually apply significant discounts, and the "class rates" serve as baseline rates only.  *See* STB Decision at 3.  Therefore, no antitrust immunity can be applicable to the rates set or charged by these companies or the LTL Fuel Surcharges at issue in this case.

102.    On May 7, 2007, the STB took the final step in deregulation and terminated its approval of the National Classification Committee and the regional rate bureaus entirely effective January 1, 2008 and any remaining limited antitrust immunity for the bureaus, finding that the bureaus were not in the public interest and had exposed shippers to "artificially inflated rates that result from collective ratemaking…".  *Id.* at 15-16; as amended 2007 WL 1852195 (S.T.B. June 27, 2007).

## ANTITRUST INJURY

103.    The unlawful contract, combination or conspiracy alleged above had and is having, *inter alia*, the following effects:

a    Prices charged by defendants and their co-conspirators to plaintiff and the members of Class for LTL freight transportation services and LTL Fuel Surcharges were maintained at artificially high and noncompetitive levels;

b    Plaintiff and members of the Class were required to pay more for LTL freight transportation services and LTL Fuel Surcharges than they would have paid in a competitive marketplace unfettered by defendants' and their co-conspirators' collusive and unlawful price-fixing; and

c    Plaintiff and members of the Class have been deprived of the benefits of free, open and unrestricted competition in the market for LTL freight transportation.

104.    During and throughout the period of the contract, combination or conspiracy alleged above, plaintiffs and members of the Class directly purchased LTL freight transportation services and paid LTL Fuel Surcharges in the United States.

105.    Plaintiff and the other Class members paid more for the LTL freight transportation services and LTL Freight Surcharges than they would have paid under conditions of free and open competition.

106.    As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, plaintiff and the members of the Class were injured and financially damages in their businesses and property, in amounts that are not presently determined.

107.    This is antitrust injury of the type that the federal laws were meant to punish and prevent.

## CLASS ACTION ALLEGATIONS

108.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the proceeding paragraphs of this Complaint.

109.    Plaintiff brings this action on behalf of itself and the members of the Class comprising:

> All persons or entities which purchased LTL freight
> transportation services and paid a LTL Fuel Surcharge
> directly to defendants or their unnamed co-conspirators
> from June 15, 2003 to the present. Excluded from the
> Class are federal entities, defendants, their co-conspirators
> and their representatives, parents, subsidiaries and
> affiliates.

110.    Plaintiff brings this action on its own behalf and as a class action under Rule 23(a), 23(b)(2) and 23 (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the Class.

111.    Due to the nature of the trade and commerce involved, plaintiff believes the Class numbers in the thousands, the exact number and identities being known only by defendants.

112.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

113.    Class members are identifiable from information and records in the possession of defendants.

114.    There are questions of law and fact common to the Class. These common questions relate to the existence of the conspiracy alleged, and to the type and common patter of injury sustained as a result thereof. The question includes but are not limited to:

   a  Whether defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize LTL Fuel Surcharges imposed for LTL freight transportation services sold in the United States;

   b  The identity of participants in the conspiracy;

   c  The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by defendants and their co-conspirators in the furtherance of the conspiracy;

   d  Whether the alleged conspiracy violated Section 1 of the Sherman Act;

   e  Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of plaintiff and other members of the Class;

   f  The effect of defendants' conspiracy on the prices of LTL freight transportation sold in the United States during the Class Period; and

   g  The appropriate measure of damages sustained by plaintiff and other members of the Class.

115. Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of other members of the Class, and plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff paid LTL Fuel Surcharges for LTL freight transportation services directly to one or more of defendants. Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class. In addition, plaintiff is represented by competent counsel experienced in the prosecution of class action antitrust litigation.

116.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

117.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

118.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by members of the Class who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

119.    The conduct of defendants and their co-conspirators has taken place in, and affected the continuous flow of interstate trade and commerce of the United States, in that *inter alia*:

a        Defendants and their co-conspirators have sold and provided LTL freight transportation services which imposed LTL Fuel Surcharges throughout the United States;

b        Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell and provide LTL freight transportation services which imposed LTL Fuel Surcharges throughout the United States;

c        In furtherance of the conspiracy alleged herein, defendants have traveled between states and have exchanged communications through interstate wire communications; and

d        The conspiracy alleged herein has affected billions of dollars of commerce. Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by plaintiff and other entities who are themselves engaged in commerce.

## CLAIM FOR RELIEF
### for Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act

120.    Plaintiff re-alleges and incorporates each and every allegation set forth above as if fully written herein.

121.    From a date unknown, but beginning at least as early as June 15, 2003, and continuing through the present, defendants and their co-conspirators have combined, conspired and/or contracted to restrain interstate trade in violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

122.    In furtherance of the unlawful conspiracy, upon information and belief, each of defendants and their co-conspirators has committed overt acts, including, *inter alia*:

a        agreeing to charge prices at certain levels and otherwise to fix, increase, maintain or stabilize prices of LTL Fuel Surcharges imposed on LTL freight transportation services sold in the United States;

b        communicating with co-conspirators regarding prices to be charged for LTL Fuel Surcharges;

34

c        meeting with co-conspirators in order to keep the existence of the conspiracy unknown as to foster the illegal anti-competitive conduct described herein; and

d        refraining from competing by refusing to offer LTL Fuel Surcharges and LTL freight transportation services at prices below the agreed-upon fixed price.

123.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of LTL Fuel Surcharges imposed on LTL freight transportation services.

124.    Defendants' anti-competitive agreement was implemented by, *inter alia*, instituting LTL Fuel Surcharges calculated by reference to publicly published indices. These coordinated price increases continued on a regular basis through the present, with the actual and intended result that plaintiff and members of the Class paid supracompetitive prices for fuel surcharges on LTL freight transportation services. Defendants falsely attributed these price increases to the cost of fuel. As a direct and proximate result of the LTL Fuel Surcharges price-fixing conspiracy, defendants have restrained competition in the LTL freight transportation services market and injured plaintiff and each Class member in their business and property in that they have each paid a higher price for LTL Fuel Surcharges and LTL freight transportation services than they would have paid absent the concerted unlawful activity.

125.    Plaintiff and the members of the Class, therefore, have been injured and financially damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

126.    The conduct of defendants and their co-conspirators constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## PETITION FOR RELIEF

WHEREFORE, plaintiff petitions that:

      A.     The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that plaintiff be appointed class representative and that plaintiff's counsel be appointed as counsel for the Class.

      B.     The contract, combination or conspiracy, and the acts done in furtherance thereof by defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

      C.     Judgment be entered for plaintiff and members of the Class against defendants, jointly and severally, for three times the amount of damages sustained by plaintiff and the Class as allowed by law, together with the costs of the action, including reasonable attorneys' fees, pre and post-judgment interest.

      D.     Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

      a.     Continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

      b.     Communicating or causing to be communicated to any other person engaged in manufacture, distribution or sale of LTL freight transportation services except to the extent necessary in connection with a bona fide sales transaction between the parties to such communications.

E.      Plaintiff and members of the Class have such other, further and different relief as

the case may require and the Court may deem just and proper under the circumstances.

### JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiff demands a jury

trial of all issues triable by jury.

Dated:  October 25, 2007.

Respectfully submitted,

**BOIES, SCHILLER & FLEXNER LLP**

By: _____
Richard B. Drubel, Jr. (D.C. Bar No. 334359)
Tanya Chutkan (D.C. Bar No. 420478)
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone:  (202) 237-2727
Fax:  (202) 237-6131
E mail:  rdrubel@bsfllp.com
        tchutkan@bsfllp.com

Joseph R. Saveri
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Embarcadero Center West
275 Battery Street, Suite 3000
San Francisco, CA 94111-3339
Telephone:  (415) 956-1000
Fax:  (415) 956-1008
E mail:  jsaveri@lchb.com

Richard L. Coffman
**THE COFFMAN LAW FIRM**
505 Orleans Street, Suite 505
Beaumont, TX 77701
Telephone:  (409) 833-7700
Fax:  (866) 835-8250
E mail:  rc@cofflaw.com

John L. Jernigan, III
Alabama Bar No.: ASB-7373-E62J
Edward L. McMillan, IV

Alabama Bar No.: ASB-1010-D66M
**JERNIGAN & MCMILLAN, P.C.**
319 Belleville Avenue
P.O. Box 828
Brewton, AL 36427
Telephone:  (251) 809-2981
Fax:  (251) 809-2980
E mail:  Johnjernigan901@bellsouth.net

This decision will be printed in the bound volumes of the STB printed reports at a later date.

35262                                SERVICE DATE – MAY 7, 2007
EB

SURFACE TRANSPORTATION BOARD

DECISION

STB Ex Parte No. 656

MOTOR CARRIER BUREAUS – PERIODIC REVIEW PROCEEDING

STB Ex Parte No. 656 (Sub-No. 1)

INVESTIGATION INTO THE PRACTICES
OF THE
NATIONAL CLASSIFICATION COMMITTEE

Section 5a Application No. 46 (Sub-No. 20)[1]

SOUTHERN MOTOR CARRIERS RATE CONFERENCE, INC.

Decided:  May 4, 2007

---

[1] This decision also embraces EC-MAC Motor Carriers Service Association, Inc., STB Section 5a Application No. 118 (Sub-No. 2); Household Goods Carriers Bureau Committee – Agreement, STB Section 5a Application No. 1 (Sub-No. 10); Machinery Haulers Association, Inc. – Agreement, STB Section 5a Application No. 58 (Sub-No. 4); Middlewest Motor Freight Bureau, Inc. – Renewal of Agreement, STB Section 5a Application No. 34 (Sub-Nos. 8 and 10); Nationwide Bulk Trucking Association, Inc. – Agreement, STB Section 5a Application No. 63 (Sub-No. 4); Application of the National Bus Traffic Association, Inc., for Extended Approval of its Conformed Agreement; STB Section 5a Application No. 9 (Amendment No. 8); National Classification Committee – Agreement, STB Section 5a Application No. 61 (Sub-No. 6); Pacific Inland Tariff Bureau, Inc. – Renewal of Agreement, STB Section 5a Application No. 22 (Sub-Nos. 7 and 8); Rocky Mountain Tariff Bureau, Inc., STB Section 5a Application No. 60 (Sub-Nos. 10 and 11); Southern Motor Carriers Rate Conference, Inc., STB Section 5a Application No. 46 (Sub-No. 21); New England Motor Rate Bureau, Inc., STB Section 5a Application No. 25 Amendment No. 8); and Western Motor Tariff Bureau, Inc. – Agreement, Section 5a Application No. 70 (Sub-No. 12).

STB Ex Parte No. 656, et al.

The Surface Transportation Board terminates its approval of the
agreements of motor carrier bureaus to engage in rate-related
collective activities.

In this decision the Board completes its periodic review, pursuant to 49 U.S.C. 13703(c), of agreements of motor carriers to engage in rate-related collective activities. After analyzing comments received from other interested persons and the submissions of the motor carrier bureaus seeking renewal of their agreements, and after reviewing the record from the prior review cycle, we have decided to terminate our approval of the agreements of all remaining motor carrier bureaus.[2] To provide sufficient time for parties to adjust to a new environment without antitrust immunity for motor carrier bureau activities, this decision will become effective in 120 days.

The termination of Board approval of the underlying agreements renders moot the requests of the Southern Motor Carriers Rate Conference and others, in Section 5a Application No. 46 (Sub-No. 20) et al., for approval to expand the geographic scope of their collective activities from regional to nationwide. Consequently, this decision also dismisses those applications.

BACKGROUND

Under 49 U.S.C. 13703(a)(1), motor carriers have authority to enter into agreements with other carriers to collectively establish rates, classifications, mileage guides, rules and rate adjustments for general application based on industry average carrier costs. Motor carriers may seek Board approval of such an agreement, 49 U.S.C. 13703(a)(2), and if they obtain that approval, their activities under the agreement are immunized from the antitrust laws pursuant to 49 U.S.C. 13703(a)(6). However, at least every 5 years the Board must review its approvals of motor carrier bureau agreements, and must change the conditions of, or terminate, its approval when necessary to protect the public interest. 49 U.S.C. 13703(c).

There are currently 11 motor carrier bureaus with Board-approved agreements conducting various activities. One of these bureaus, the National Classification Committee, comprised of motor carrier members, establishes freight commodity classifications. The NCC assigns to each commodity a numerical "rating" based on four transportation characteristics—

---

[2] The 11 bureaus that have sought renewal of Board approval of their agreements are:
EC-MAC Motor Carriers Service Association, Inc.; Household Goods Carriers Bureau
Committee (HGCBC); Machinery Haulers Association, Inc.; Middlewest Motor Freight, Inc.;
Nationwide Bulk Trucking Association, Inc.; National Bus Traffic Association, Inc. (NBTA);
National Classification Committee (NCC); Pacific Inland Tariff Bureau, Inc.; Rocky Mountain
Tariff Bureau, Inc.; Southern Motor Carriers Rate Conference, Inc. (SMCRC); and Western
Motor Tariff Bureau, Inc.

STB Ex Parte No. 656, et al.

density, stowability, ease of handling, and liability for breakage or loss.[3] Motor carrier rate bureaus, acting independently of NCC, then develop collective rates (referred to as class rates) based on the classification ratings developed by NCC and other movement characteristics that they consider relevant, such as distance, shipment weight, and whether the shipment is truckload or less-than-truckload (LTL). Class rates tend to increase with the classification rating. In other words, all other things being equal, a shipment with a classification rating of 100 will have a lower final charge than a shipment with a classification rating of 200.

Prior to the reforms of the Motor Carrier Act of 1980 (1980 Act),[4] shippers were far more likely to be charged the class rates set by rate bureaus.[5] Now, many carriers, especially the larger ones, set their rates individually according to their own costs and market conditions, and they separately publish their own rates. Those carriers that do continue to use a class rate system usually apply significant discounts to the class rates due to competition among carriers. For those carriers and the shippers that use them, the class rates can serve as a baseline and a common language for further negotiations. The bureaus argue that the class-rate system reduces the need for shippers and carriers to retain large amounts of data that would otherwise be required to solicit and generate rate quotes.

Rate bureaus also compute general rate increases (GRI) for their members. GRIs are initiated, at least in part, to improve participating carriers' operating ratios by factoring in industry-wide increases in costs.

Other services provided by motor carrier bureaus include mileage guides and cost studies. In addition, SMCRC markets a service known as "Czar-Lite," which has been discussed extensively in this and prior proceedings. Czar-Lite is a nationwide database of the rates collectively set by all of the bureaus, and it is available on-line for a fee. It provides a commercial replacement for the information dissemination function of tariffs that previously were filed with the Board's predecessor, the Interstate Commerce Commission (ICC).

The collective rate-related activities of the NBTA and the HGCBC are tailored to the bus and household goods industries, respectively. They are described in greater detail infra.

---

[3] See Investigation into Motor Carrier Classification, 364 I.C.C. 906 (1981) and 367 I.C.C. 243 (1983), aff'd, National Classification Committee v. United States, 765 F.2d 1146 (D.C. Cir. 1985).

[4] Pub. L. No. 96-296, 94 Stat. 793 (1980).

[5] In 1976 there were only 9,261 notices of "independent action" by carriers in the bureau system. By 1981, there were more than 80,000 such notices. See Motor Carrier Ratemaking Study Commission, Collective Ratemaking in the Trucking Industry; A Report to the President and the Congress of the United States, at Ch. 4, Exh. 14 (1983) (Motor Carrier Ratemaking Study).

- 3 -

STB Ex Parte No. 656, et al.

Prior Review Cycle. In the prior review cycle, the Board imposed more restrictive conditions on its renewed approval of most bureau agreements.[6] NCC was required to amend its agreement to provide for: (1) shipper access to critical information at an earlier stage in the classification process; (2) resolution of classification dockets by a single, expedited decision; and (3) the right to seek an initial review of that decision by a neutral arbitrator.[7] The rate bureaus were required to amend their agreements to: (1) furnish a "truth-in-rates notice" when collective rates are quoted, disclosing the range of discounts offered by member carriers; and (2) prohibit the use of a loss-of-discount penalty for late payment of charges.[8]

Current Review Cycle. In December 2004, the Board commenced the current review of all outstanding motor carrier bureau agreements in STB Ex Parte No. 656.[9] Because a number of the comments received were directed solely to NCC, in October 2005, the Board commenced a separate investigation into NCC's activities in STB Ex Parte No. 656 (Sub-No. 1).[10]

Expansion Requests. In 1994, SMCRC, which currently conducts collective ratemaking activities on a regional basis, sought approval to operate on a nationwide basis.[11] In response,

---

[6] Board approval of the NBTA agreement was renewed without conditions. Application of the National Bus Traffic Association, Inc., for Extended Approval of its Conformed Agreement, Section 5a Application No. 9 (Amendment No. 8) (STB served May 24, 2002). The Board did not rule at that time on the application for renewed approval of the HGCBC, which has continued to operate under its previously approved agreement.

[7] See National Classification Committee – Agreement, 3 S.T.B. 917 (1998), 4 S.T.B. 496 (2000), 5 S.T.B. 1077 (2001), and Section 5a Application No. 61 (Sub.-No. 6) (STB served Mar. 27, 2003, Oct. 16, 2003, and Dec. 10, 2003).

[8] See Rate Bureau Agreements – EC-MAC Motor Carriers Service Assoc., Inc., et al., 5 S.T.B. 1065 (2001); Section 5a Application No. 118 (Sub.-No. 2) (STB served Mar. 27, 2003 (EC-MAC-II), and Oct. 16, 2003); Niagara Frontier Tariff Bureau, Inc. – Agreement, STB Section 5a Application No. 45 (Amendment No. 17) (STB served Oct. 16, 2003); Middlewest Motor Freight Bureau, Inc. – Renewal of Agreement, STB Section 5a Application No. 34 (Sub-No. 10) (STB served Jan. 21, 2004); and Pacific Inland Tariff Bureau, Inc. – Renewal of Agreement, STB Section 5a Application No. 22 (Sub-No. 8) (STB served Jan. 15, 2004).

[9] See Motor Carrier Bureau – Periodic Review Proceeding, STB Ex Parte No. 656 (STB served Dec. 1, 2004), revised (STB served Jan. 21, 2005).

[10] See 70 FR 60881 (Oct. 19, 2005).

[11] SMCRC's original application for expansion was docketed as Section 5a Application No. 46 (Amendment No. 19). In 1996, SMCRC submitted a revised application, which was docketed as Section 5a Application No. 46 (Sub-No. 20). A proposal for minor changes to its agreement that was unrelated to the proposed expansion was separately considered and approved in Southern Motor Carriers Rate Conference, Inc., Section 5a Application No. 46 (Amendment No. 20) (STB served Sept. 4, 1997).

- 4 -

STB Ex Parte No. 656, et al.

six other regional rate bureaus sought approval to operate nationwide in the event that SMCRC received such approval. All of the territorial expansion requests were subsequently consolidated and merged into a broader proceeding to determine whether continued approval of existing agreements was warranted.[12]  In EC-MAC Motor Carriers Service Assoc., Inc., et al., 3 S.T.B. 926, 935 (1998) (EC-MAC-I), the Board delayed consideration of the matter, at the request of certain members of Congress, in anticipation of further Congressional action regarding motor carrier bureaus.

In December 1999, Congress amended the statute to prohibit the Board from approving geographic expansion of regional rate bureaus to operate nationwide.[13]  In February 2003, Congress removed that prohibition.[14]  Accordingly, in November 2003, SMCRC renewed its request for approval to conduct collective ratemaking nationwide. The Board reopened the record and sought comments on the renewed request.[15]

A summary of all of the filings received in this case is provided in the Appendix.

## DISCUSSION AND CONCLUSIONS

Our action today represents the final step in a process that began more than a quarter century ago of making the motor carrier industry fully competitive. The 11 remaining rate bureaus constitute the vestige of a system of collective ratemaking developed during a period of extensive regulatory intervention in the transportation marketplace. Given the maturity and vitality of the motor carrier industry, that system is incompatible with a free market-based and fully competitive system.

Both collective ratemaking and the debate about whether such activity should be shielded from the antitrust laws have been a part of the motor carrier industry since its inception. The difficulties of the Great Depression had a profound effect on the ability of all American industries to earn compensatory revenues. As part of President Franklin Roosevelt's New Deal, Congress passed the National Industrial Recovery Act[16] (NIRA), which replaced free market competition with cooperative action subject to regulatory oversight. NIRA was intended to

---

[12]  See 59 FR 25121 (May 13, 1994) (consolidating the requests and seeking comments); and 62 FR 27653 (May 20, 1997) (broadening the territorial expansion proceedings and seeking additional comments on all relevant issues, including fundamental questions about the role of the rate bureaus and the need for antitrust immunity in the current environment).

[13]  See former 49 U.S.C. 13703(d) (2000).

[14]  See section 354 of the Omnibus Appropriations Act FY 2003, Pub. L. No. 108-7, 117 Stat. 11 (Feb. 20, 2003); H.R. Conf. Rep. No. 108-10 (2003).

[15]  69 FR 13620 (Mar. 23, 2004).

[16]  Ch. 90, 48 Stat. 195 (1933).

STB Ex Parte No. 656, et al.

stimulate the economy through the promotion of "codes of fair competition" and the standardization of certain business practices. The code governing the motor carrier industry, developed by the new motor carrier rate bureaus, required that each carrier file a schedule of minimum rates and tariffs.[17]

After NIRA was struck down by the Supreme Court, Congress passed the Motor Carrier Act of 1935[18] (the 1935 Act), which initiated a system under which the ICC restricted new entry into the trucking business and approved specific routes. The 1935 Act also required motor carriers to file tariffs with the ICC 30 days in advance, allowed protest from other common carriers of a proposed tariff, and required that carriers' rates be reasonable "as to both minimum and maximum."[19] The underlying rationale of the 1935 Act was that the motor carrier sector was economically unstable and that cut-throat competition might destroy the fledgling industry.

In 1948, with the motor carrier industry facing antitrust lawsuits and investigations by the U.S. Department of Justice and several states regarding collective activity, Congress passed the Reed-Bullwinkle Act (Pub. L. No. 80-662, 62 Stat. 472 (1948)). That act allowed rate bureaus operating under ICC-approved agreements to set rates collectively, and it immunized the activities of bureaus operating under an ICC-approved agreement from the antitrust laws.

In the environment of pervasive regulation, almost all carriers belonged to a rate bureau. Most customers paid the undiscounted class rates that the bureaus set and published for their member carriers. The bureaus also published adjustments to those rates (whether reductions or increases) that any member carrier might request. The bureaus calculated and published, for their member carriers, the amounts of any across-the-board increases or decreases to rates that should be applied to take into account changes in the carriers' labor and fuel costs. All rates were subject to regulatory challenge.

The regulatory environment has changed substantially since the bureaus began. As the Interstate Highway System was built and trucks, rather than the railroads, came to dominate the carriage of manufactured goods, the motor carrier industry achieved financial stability and the original rationale for restrictive motor carrier regulation ceased to exist. A significant turning point was the 1980 Motor Carrier Act, in which Congress essentially repealed interstate motor carrier regulation in order to promote competition.[20] The 1980 Act curtailed the permissible

---

[17] See Motor Carrier Ratemaking Study at 455, 534.

[18] Ch. 498, 49 Stat. 543 (1935).

[19] See Franklin D. Roosevelt, Statement on Signing the Motor Carrier Act, Aug. 9, 1935 at http://www.presidency.ucsb.edu/ws/index.php?pid=14912.

[20] See H.R. Rep No. 96-1069, at 3 (1980) ("Th[is] legislation establishes a new Federal policy which is to promote a competitive and efficient motor carrier industry . . . ."); Central & Southern Motor Freight Tariff Ass'n v. United States, 757 F.2d 301, 309-12 (D.C. Cir. 1985).

STB Ex Parte No. 656, et al.

activities of rate bureaus seeking continued regulatory approval.[21]  Then, in 1994, Congress removed the requirement that motor carriers of general freight file tariffs.[22]

In the ICC Termination Act of 1995 (ICCTA),[23] Congress removed most of the remaining framework of pervasive regulation in favor of more robust competition.  It eliminated regulation of motor carrier rates altogether, except for rates for household goods movements, rates for joint motor-water movements in noncontiguous domestic trade,[24] and rates set collectively by motor carrier bureaus.[25]  Congress also mandated a periodic review of existing motor carrier bureau agreements under a "public interest" standard, presumably in recognition of the prospect that the deregulated environment could render government approval of motor carrier collective activities and continued antitrust immunity inappropriate.

Four years later, Congress rejected a proposed amendment that would have "made the STB's review discretionary rather than mandatory and return[ed] the process for reviewing these [agreements] to what it was prior to [ICCTA]."[26]  Instead, Congress retained a mandatory periodic review of all agreements, requiring the Board to take a fresh look "every five years [at] any agreement for any activities approved under Section 13703."[27]

---

[21]  Among other things, the Act prohibited bureaus and their members from interfering with any carrier's right to publish its own rates and prohibited bureau members from voting on rate proposals in which they did not participate, other than general rate increases, changes in commodity classifications, and changes in tariff structure.  See former 49 U.S.C. 10706(b)(3).  Congress also provided for an independent study of motor carrier ratemaking to review what role, if any, the rate bureaus should continue to have. The group assigned to conduct the study recommended the "complete elimination" of antitrust immunity for motor carrier ratemaking, finding that it restrains competitive behavior.  See Motor Carrier Ratemaking Study at summary p. xv and p. 534.  To date, that recommendation has not been carried out.

[22]  Trucking Industry Regulatory Reform Act, Pub. L. No. 103-311, 108 Stat. 1673 (1994).

[23]  Pub. L. No. 104-88, 109 Stat. 803 (1995).

[24]  The term "noncontiguous domestic trade" refers to domestic (as opposed to international) movements originating in or destined to Alaska, Hawaii, or a territory or possession of the United States.  See 49 U.S.C. 13102(5).

[25]  See 49 U.S.C. 13701.

[26]  145 Cong. Rec. H10060-01 (Oct. 14, 1999); 49 U.S.C. 13101(b).

[27]  145 Cong. Rec. H12874 (Nov. 18, 1999).  Board approval of an agreement does not expire on its own.  Rather, existing agreements "shall continue unless the Board determines otherwise."  49 U.S.C. 13703(c)(2).

- 7 -

STB Ex Parte No. 656, et al.

Since extensive regulation ended, the motor carrier industry has continued to increase its share of the nation's total freight expenditures.[28]  The extensive regulation of the past served to protect the motor carrier industry from, among other things, what was perceived to be the threat of destructive intramodal competition.  Based on this record, there is no longer any need for the controlled conditions under which the industry developed.  Such conditions stifle competition.

The Public Interest Standard.

Congress has directed us to approve motor carrier collective agreements only if we find that such agreements are in the public interest, and to terminate our approval of existing agreements when "necessary to protect the public interest."[29]  Our determination of what actions are necessary to protect the public interest with respect to existing agreements is governed by the transportation policy set forth in 49 U.S.C. 13101(a).[30]  These regulatory policy goals are replete with the Congressional desire for fair competition, reasonable rates, pricing flexibility and efficiency.

By mandating a periodic review of all agreements every 5 years, we believe Congress has directed us not only to review new developments that could affect our reasoning in prior decisions, but also to take a fresh look at the evidence and past reasons for finding any existing agreement to be in the public interest.[31]  In the past, when the Board (and the ICC before it) has considered whether to approve certain collective agreements, it has evaluated:  (1) whether the agreement furthers (or hinders) national transportation goals, (2) whether the agreement has anticompetitive effects, and if so, (3) whether the public benefits to the agreement outweigh any anticompetitive effects.[32]  We believe that this approach is also an appropriate way to assess whether termination of approval is necessary to protect the public interest.

The transportation policy that guides this agency's actions regarding motor carriers is set out at 49 U.S.C. 13101.  Specifically, as pertinent here, section 13101(a)(2) provides that it is the

---

[28]  In 1980, approximately 70% of the nation's total freight expenditures were paid to motor carriers, compared with 87% in 2004.  Motor Carrier Ratemaking Study at 42; Assessing the Motor Carrier Industry and Its Segments:  Current and Prospective Issues, 2006 at 1, Prepared for Analysis Division, Office of Research and Analysis, Federal Motor Carrier Safety Administration (Apr. 1, 2006).

[29]  49 U.S.C. 13703(c)(1).

[30]  See 145 Cong. Rec. H10060-01 (Oct. 14, 1999); 49 U.S.C. 13101(b).

[31]  Congress's decision to have Board members appointed to 5-year terms means that each periodic review will likely be presided over by a Board with a different composition than in the prior review.

[32]  See, e.g., Western Railroads Agreement, 364 I.C.C. 1 (1980); Household Goods Forwarders Tariff Bureau, Section 5a Application No. 106 (ICC served Aug. 7, 1991).

- 8 -

policy of the United States Government, in overseeing transportation by motor carrier, to promote competitive and efficient transportation services in order to—

> (A) encourage fair competition, with reasonable rates for transportation by motor carriers of property,

> (B) provide efficiency in the motor carrier transportation system. . .

> (D) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping and traveling public. . .

> (I) improve and maintain a sound, safe and competitive privately owned motor carrier system. . . .

The motor carrier transportation policy thus supports the promotion of competition in the motor carrier industry.

The 11 agreements immunize the participants from the application of the antitrust laws, in particular, as most relevant here, the Sherman Act. The fundamental purpose of the Sherman Act is to promote fair competition for the benefit of consumers and the economy. Section 1 of the Sherman Act prohibits agreements that unreasonably restrain trade.[33] Courts have construed section 1 as an absolute bar to certain types of agreements that "always or almost always tend to restrict competition and decrease output."[34] This includes agreements between competitors to fix prices, regardless of the "reasonableness" of the fixed price or the justifications for the arrangement.[35] Courts have condemned such horizontal pricing agreements[36] as per se unlawful even when the agreements relate only to maximum or "list" prices that are routinely discounted in the marketplace.[37]

---

[33] 15 U.S.C. 1. While section 1 literally prohibits all agreements in restraint of trade, the Supreme Court long ago construed the statute to prohibit only unreasonable restraints of trade. See Standard Oil Co. v. United States, 221 U.S. 1, 58 (1911).

[34] Broadcast Music, Inc. v. CBS, 441 U.S. 1, 19-20 (1979) (BMI).

[35] See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223 (1940).

[36] Horizontal price-fixing refers to an agreement between direct competitors at the same level of a market. In contrast, vertical price-fixing refers to agreements between parties at different levels in a market, e.g., an agreement between a product manufacturer and a retail dealer.

[37] See, e.g., In re High Fructose Corn Syrup Antitrust Litigation, 295 F.3d 651, 656 (7th Cir. 2002) (High Fructose) ("An agreement to fix list prices is . . . a per se violation of the Sherman Act even if most or for that matter all transactions occur at lower prices. . . . [S]ellers
(continued...)

STB Ex Parte No. 656, et al.

Antitrust immunity can be an integral part of a system of economic regulation that limits entry and protects existing carriers, while the application of the antitrust laws is consistent with a deregulated system of free market competition. Although the trucking industry was deregulated in 1980, this agency has permitted the industry to retain its antitrust immunity, subject to increasingly stringent restrictions, for more than a quarter century since that date. The remnants of the once pervasive system of collective ratemaking based on antitrust immunity represented by these 11 agreements have become increasingly anomalous with each passing year. The time has come to bring the legal environment in which the motor carrier industry operates into conformity with the economic realities that govern its behavior.

We conclude that termination of Board approval of all outstanding motor carrier bureau agreements has now become necessary and appropriate to protect the public interest. The public has a significant interest in having the competitive market set the rates for all shippers, without the restraint on competition that collectively set, antitrust-immunized class rates can produce. Our action today will protect all shippers, especially the small-volume or infrequent shippers who are most likely to lack the bargaining power to obtain market-driven discounts from the collectively set class rates.[38] We are confident that our approval of bureau agreements can be terminated without creating unfair or destructive competitive practices,[39] and without significant adverse effect on the efficiency or profitability of motor carrier operations,[40] or other policies favored under section 13101(a).

By terminating our approval of the motor carrier agreements, we fulfill our responsibility to "encourage fair competition, and reasonable rates by motor carriers,"[41] and usher the motor carrier industry into a fully competitive era. Prior Board and ICC approval of motor carrier bureau agreements may have been appropriate under the facts and circumstances of the past. However, continued reliance on the collectively set class rate system to "simplify" rate quoting is no longer worth the inevitable resulting reduction in competition. Advances in technology, the Internet and other communication tools make it easier for carriers and shippers to exchange the information necessary to solicit and generate rate quotes in a timely matter. Thus, based on our statutory mandate to protect the public interest, the record before us, and current market

---

(...continued)
would not bother to fix list prices if they thought that there would be no effect on transaction prices.").

[38] See 49 U.S.C. 13101(a)(1)(D) and (a)(2)(A) (transportation policy favoring reasonable rates for shippers).

[39] See 49 U.S.C. 13101(a)(1)(D) and (a)(2)(A).

[40] See 49 U.S.C. 13101(a)(1)(B), (a)(2)(B), and (a)(2)(E). See also 49 U.S.C. 13101(a)(1)(C) and (2)(F) and (I).

[41] See 49 U.S.C. 13101(a)(2)(A).

STB Ex Parte No. 656, et al.

conditions, we have looked anew at the benefits, costs, and appropriateness of collective ratemaking and attendant antitrust immunity.

We recognize that termination of approval of bureau agreements is a significant step beyond this agency's past approach of conditioning its approval on measures designed to reduce the potential for abuse, such as the procedural reforms imposed on NCC and the truth-in-rates requirement imposed on rate-setting bureaus. The bureaus argue that circumstances have not changed dramatically since the prior review cycle so as to justify a departure from that prior practice. However, the Board has both the authority and responsibility to take a fresh look at the evidence and arguments received here and in prior proceedings and to reconsider the sufficiency and effectiveness of its past approaches in light of current market conditions.[42] Indeed, in conducting a congressionally mandated periodic review, an agency has a duty to examine issues critically in each periodic review and should not simply rest on prior findings.[43]

Having completed the most recent periodic review, including comments and oral argument, we conclude that the reforms imposed in the past do not ensure that the competitive marketplace will determine the actual rates charged to shippers. Rather, we are now persuaded that the motor carrier collective ratemaking system is obsolete in this deregulated robust competitive market and that motor carrier bureaus should no longer be immunized from the antitrust laws. Our termination of approval of bureau agreements should not adversely affect any beneficial bureau activities that may promote the flow of commerce without harming competition – it will merely subject the bureaus to the same antitrust rules that govern the vast majority of industries in the private sector of our economy.

Our decision terminating approval of the bureau agreements does not prohibit carriers from entering into agreements with each other to engage in collective activities related to ratemaking, classification or any of the other subjects enumerated in section 13703(a)(1)(A)-(G). Section 13703(a) expressly provides carriers with "authority to enter" into such agreements, and does not require that agreements be submitted to the Board. The statute also explicitly states that termination of Board approval of a bureau agreement "has effect only as related to the application of the antitrust laws." 49 U.S.C. 13703 (c)(1). Thus, the basic question before us today is whether termination of antitrust immunity for bureau agreements is necessary to protect the public interest.[44] We find that it is.

---

[42] See Household Goods Forwarders Tariff Bureau v. ICC, 968 F.2d 81, 84 (D.C. Cir. 1992) ("An agency may change its position as long as it provides a reasoned basis for its decision.").

[43] See Fox Television Stations, Inc. v. FCC, 280 F.3d 1027, 1043 (D.C. Cir. 2002).

[44] We disagree with the assertion that issues of the benefits and costs of antitrust immunity in the context of motor carrier rate bureaus are not properly before us in this

(continued…)

- 11 -

STB Ex Parte No. 656, et al.

With that explanation of our general views on the issues, we now turn to a more specific examination and discussion of each of the various activities of motor carrier bureaus.

Collective Ratemaking

Overview.

At this point, continuation of rate-related collective activities by motor carrier bureaus free from exposure to the antitrust laws would have little, if any, public interest benefit. It is not necessary to further any remaining motor carrier regulation, which consists mainly of safety regulation by the Federal Motor Carrier Safety Administration (FMCSA). Nor is it necessary to allow motor carriers to interline, to set their own rates, to standardize packaging, or to cooperate in other ways for the sake of efficient operation.

Nearly all other industries price their goods and services in an environment that is fully subject to the antitrust laws. There is no longer any compelling reason why the antitrust laws should not apply equally to the motor carrier industry, where competition, and not regulation, governs rates and entry.[45] Continued antitrust immunity for collective rate-related activities can only hinder the full operation of the competitive forces unleashed by deregulation – forces that should induce firms to operate more efficiently and pass savings on to customers.

The Board's most recent approach of conditioning continued approval of the system of setting class rates upon adherence to a "truth-in-rates" notice, and a prohibition of loss-of-discount penalties for late payments does not go far enough to protect the public interest. Despite the bureaus' apparent adherence to the conditions, shippers' core concern – that collective ratemaking, even when subject to discounting, can lead to higher prices – remains. Because motor carriers no longer need protection from the antitrust laws, to preserve the status quo would deprive shippers of the full benefits of competition and therefore be contrary to the public interest.

Views of Other Federal Observers.

Our assessment of the adverse effects of the current immunized system is shared by the Department of Justice (DOJ) and Department of Transportation (DOT), both of which have participated in these proceedings. Both of those agencies are convinced that collective ratemaking likely leads to prices above competitive levels (the levels that would prevail if prices

---

(...continued)
proceeding. See, e.g., SMCRC Reply Comments, filed Apr. 1, 2005, in STB Ex Parte No. 656, at III.A p. 1.

[45] A different conclusion might be reached in an industry still subject to pervasive regulation. It is a widely held view that the more deregulated an industry becomes, the greater the role the antitrust laws should play.

- 12 -

were only set individually, according to competitive market forces). As DOJ points out, rate bureaus provide motor carriers with an otherwise-unavailable forum in which they can meet with their competitors, exchange cost information, discuss preferences on prices, resolve differences among firms, and agree to raise rates across the board through a general rate increase. According to DOJ, such communications inevitably lessen price competition among carriers and may also reduce competition on non-price terms of service. Further, by serving as a focal point for pricing decisions, use of a collectively set general rate increase (GRI) promotes a higher market price than would otherwise result. DOJ explains that the mere existence of a collectively determined GRI gives each trucking firm greater reason to expect that its rivals will take rate actions that are in line with the bureau-set GRI. Thus, a motor carrier may increase its rates in anticipation that other motor carriers will act likewise.

DOT agrees that granting collective ratemaking immunity from antitrust laws deprives the shipping public of the full benefit of the competitive market forces enjoyed by shippers using other modes of transportation. It argues that trucking does not present a unique situation warranting such special status. DOT further argues that the previously imposed consumer protection measures, such as the truth-in-rates notice and the unavailability of the loss-of-discount penalty for late payments, have not been effective in assuring competitive rates, as indicated by the shipper opposition to renewed approval of rate bureau agreements.[46]

At least one federal court of appeals has also expressed public interest concerns about motor carriers' ability to set rates collectively with antitrust immunity. In Central & S. Motor Freight Tariff Ass'n v. United States, 777 F.2d 722, 730 (D.C. Cir. 1985), the court reasoned that, "even if one adopts a benign view of rate bureau activities and assumes that the bureaus do not use their mantle of antitrust immunity to establish monopolistic prices, the ability to set rates collectively nonetheless permits association members to earn larger, or at least more stable, profits than they could in the absence of joint rate-setting." Thus, while "participation in rate bureaus immune from the antitrust laws . . . produces benefits for the carriers [, it is] fraught with danger for the public." Id. at 733.

Role of Discounting and General Rate Increases.

The bureaus argue that the pervasive discounting off of the class rates shows that collective ratemaking does not adversely affect competition and the level of rates. In 1991, the ICC accepted this argument and concluded that the activities of rate bureaus were therefore essentially benign.[47] The ICC recognized that the level of discounts varied significantly between

---

[46] Shipper organizations do not view the existing protections as sufficient. See Opening Comments of the National Small Shipments Traffic Conference, Inc., and the National Industrial Transportation League (NASSTRAC/NITL), filed Mar. 2, 2005, in STB Ex Parte No. 656, at 9.

[47] Investigation of Motor Carrier Bureau Practices, 7 I.C.C.2d 388, 463 (1991) (Investigation).

shippers but speculated that the full class rates were most likely paid by shippers who might be able to protect themselves by more careful rate shopping.[48]

But, as the Board has recognized, the ICC did not give enough attention to the interests of those "disadvantaged shippers" who receive lesser or no discounts[49] not because they have failed to shop for discounts, but because they lack bargaining power.[50] They are likely to be low-volume shippers, shippers outside of major traffic lanes, or shippers in emergency situations. While withdrawal of antitrust immunity will not, by itself, increase any shipper's bargaining power (i.e., a small shipper will still be a small shipper), it will at least deter carriers from augmenting their own bargaining power by acting collectively. Presumably, a carrier would not continue to pay for membership in a rate bureau if its participation did not yield it additional revenues. Thus, it would appear either that enough disadvantaged shippers are charged bureau-set rates to make collective ratemaking financially worthwhile for carriers, or that an artificially high but industry-accepted collectively set starting point can lead to higher rates even after discounting.[51]

SMCRC witness Middleton confirmed that casual or infrequent shippers receive lesser discounts, but he attributed this to less attractive shipment density and freight characteristics.[52] One problem with this explanation is that the effect of varying shipment density and other freight characteristics already should be reflected in either the classification system (density, stowability, etc.) or the class rates (weight, distance, truckload or less-than-truckload), if the system is working properly.[53] Thus, if a shipment takes up an unusual amount of trailer space in relation to its weight, has stowability problems, or cannot spread its platform handling costs over a long distance, the base (undiscounted) rate should reflect these characteristics. In any event,

---

[48] Id.

[49] EC-MAC-I, 3 S.T.B. at 931.

[50] See HCPDC/NASSTRAC Comments filed Aug. 18, 1997, in EC-MAC-I, at 8-9; NASSTRAC/NITL Opening Comments, filed Mar. 2, 2005, in STB Ex Parte No. 656, at 6-7.

[51] As one court has observed: "Many sellers are blessed with customers who are 'sleepers,' that is, customers who don't shop around for the best buy; and even for those who do bargain for a lower price, the list price is usually the starting point for the bargaining and the higher it is (within reason) the higher the ultimately bargained price is likely to be." High Fructose, 295 F.3d at 656.

[52] Statement filed in Section 5a Application No. 46 (Sub-No. 20), on April 21, 2004, by Jack E. Middleton, Attachment 3, at 7. Witness Middleton's assertion that all shippers receive an automatic discount of at least 20% even if they do not negotiate means simply that the true collectively set rate is actually 80% of the nominal class rate.

[53] See EC-MAC-I, 4 S.T.B. at 508 n.11.

even without antitrust immunity, carriers can set their rates to reflect the cost differentials described by witness Middleton, but they would have to do so on an individualized basis.

In its 1991 decision, the ICC further reasoned that the needs of disadvantaged shippers did not warrant special attention because there was enough capacity in the trucking market to enable even small or occasional shippers to find carriers to serve them at competitive rates.[54] However, the ICC's reasoning assumed a perfect flow of information to match the needs of disadvantaged shippers to carriers with available capacity, which is not necessarily the case.

In assessing the public interest, we must give significant consideration to the interests of disadvantaged shippers – the parties least able to self-protect and therefore most likely to have artificially high rates set by collective action.  Termination of Board approval is the best way to protect their interests.  As the Board has explained, "[o]ne feature of more competitive markets is that the benefits of low prices are broadly spread among the entire market of consumers, regardless of the fact that submarkets of consumers would, in the absence of competition, be willing to pay more for a good or service rather than do without it."[55]

Finally, it is noteworthy that the bureaus continued to implement GRIs on a regular basis, even in the face of extensive discounting off of the collectively set class rates.  The record shows that, at least during the 1990s, collectively set rates, as increased by GRIs, increased substantially more than either the general rate of inflation (as measured by the Producers Price Index, or PPI) or the transportation rate of inflation (as measured by the Transportation Index, another Bureau of Labor Statistics series).[56]  Thus, even those shippers who receive larger discounts may be subjected to rate increases, through the application of collectively set GRIs, that are larger and more frequent than they would be without collective action through rate bureaus.  In short, at every shipper level, the class rate system can lead to higher rates than might otherwise be charged.

Any shipper can challenge a collectively set rate—whether a class rate or a GRI—before the Board.  But given the range and scope of shippers' exposure to the artificially inflated rates

---

[54]  Investigation, 7 I.C.C.2d at 463.

[55]  EC-MAC-II, 3 S.T.B. at 932 [footnote omitted].

[56]  On average, the Transportation Index increased 40%, while class rates increased 100%.  See Comments of Health & Personal Care Distribution Conference, Inc., and National Small Shipments Traffic Conference, Inc. (HPCDC/NASSTRAC), filed in EC-MAC-I proceeding Aug. 18, 1997, at 8 and Appendix A.  A bureau witness argued that collective rates increased by a lesser amount, based on the LTL Trucking component of the PPI.  See Reply Comments of EC-MAC Motor Carriers Service Association, Inc., filed in EC-MAC-I proceeding Oct. 17, 1997, Statement of Irwin H. Silberman.  But this component of the PPI measures changes in the actual less-than-truckload rates charged (including discounts), not changes in bureau-set rates.

that result from collective ratemaking, we are not convinced that this is an adequate or practical remedy. Rather, the large numbers of shipments affected by the rate bureaus' pricing practices, combined with the relatively modest per-shipment cost (compared to bulk shipments by rail, for example), as well as the time commitment required to pursue a regulatory challenge, argues for a more comprehensive approach. Reliance on mitigating the harms of collective rate-setting through increased regulation would not be sound policy when a more direct approach – termination of bureau approval – is readily available and better promotes market-based incentives and solutions.

Common Rate Format.

The bureaus argue that the present system of collectively set class rates is in the public interest and actually promotes competition by allowing shippers to compare rates in a common format. According to the bureaus, it is easier for shippers to compare the discounts offered off benchmark rates than it would be to compare individual, lengthy rate tariffs of each carrier they may consider using.

The shipper organizations that have participated in these proceedings do not see a need for a class rate system, however. They seek an end to collective rate-setting altogether. They believe they have no more need for a collectively set class-rate system than for the discontinued system of filed tariffs.

We too fail to see how use of a class rate as a baseline simplifies the process for shippers. Whether carriers use a common baseline or their own individual rate schedules, a shipper seeking competitive rate quotations must approach each carrier individually, providing the same information about the specifics of the particular movement (weight, distance, time, etc.), and ask for a market rate quote. To obtain competitive rate quotations that are truly useful, a shipper needs to know the final rates and charges for the specific movement, not simply percentage discounts taken from bureau tariffs (which may themselves differ where regions overlap). Under the discount-quotation system defended by the bureaus, if a carrier responds by quoting only a discount percentage and not the resulting rate, the shipper will have to consult the appropriate baseline tariff and "do the math" required to apply the quoted percentage to determine the rate. In short, shippers do not need a rate quotation to be expressed as a percentage off of a benchmark rate in order to understand it and may find it more useful to obtain competitive rate quotations in dollar terms.

Change of Approach.

In the prior review cycle, the Board recognized the adverse effect of collective ratemaking on the policy of section 13101(a) favoring competition and reasonable rates. But the Board stopped short of terminating approval of motor carrier bureau agreements at that time. Rather, in EC-MAC-I, 3 S.T.B. 926 (1998), the Board moved to condition its continued approval of motor carrier bureau agreements on actions by the bureaus to reduce their collectively set rates to market-based levels. The Board asked parties to suggest a methodology to effect a reduction

STB Ex Parte No. 656, <u>et al.</u>

of class rates to prevailing levels, but no bureau (or other party) responded with a workable approach. Accordingly, in <u>EC-MAC-II</u>, the Board switched to a truth-in-rates approach, requiring dissemination of information about the actual competitive pricing environment.

Upon review, we are not satisfied that the truth-in-rates measure adequately addresses the adverse effects associated with allowing carriers to collectively set benchmark rates with immunity from the antitrust laws. We believe that the threat of antitrust prosecution, and the availability of treble damages, will be far more effective. It will directly address the public interest concerns relating to carriers' ability to signal actual rate movements through GRIs, and to maintain the artificial pricing "cushion" that class rates can facilitate that is neither cost-based nor market-based.

We believe this action is necessary and appropriate to address the public interest as articulated in 49 U.S.C. 13101. The public interest in fair competition and reasonable rates [section 13101(a)(2)(A)] is paramount here and should not conflict with other national policies regarding motor carrier transportation. Maximizing competition in the motor carrier industry should not lead to destructive competition or predatory pricing [section 13101(a)(1)(D)]. Collective ratemaking does not advance service to small communities [section 13101(a)(2)(G)], as rate bureaus are not authorized under section 13703(a)(1) to address service, individual markets, or the way that carriers respond to one another's rates.

The connection between antitrust immunity for collective ratemaking and the furtherance of other statutory policies, such as adequate profits, fair wages and working conditions [section 13101(a)(2)(F)] and safety [section 13101(a)(2)(I)] is tenuous at best. The fact that a carrier posts higher earnings (at the expense of its customers) does not mean that it will pay its employees more or that it will operate a safer fleet of trucks. It should be noted that DOT, which regulates safety, does not express any concern that ending rate bureau approvals will adversely affect safety.

Nor do we believe that collective ratemaking is supported by the public's interest in motor carrier efficiency [section 13101(a)(2)(B) and (F)], as the bureaus suggest. The starting point for developing or negotiating rates need not and ought not be to set rates collectively. Trade associations for other industries commonly publish aggregated non-collectively set prices charged in markets without violating antitrust laws.[57] Almost all prices in our economy are set without reference to a collectively established baseline price, and, like DOJ and DOT, we see no reason why trucking rates should be an exception.

<u>Bus Transportation</u>

Collective activity by bus carriers differs from that of freight carriers. While the NBTA does not collectively establish fares for passengers, it does establish charges relating to the

---

[57] <u>Report on the Functions of the Interstate Commerce Commission</u> at 23.

handling of baggage and express packages. It also establishes rules relating to their handling. These rules are described in the Board's decision renewing approval of NBTA's agreement in the prior review cycle.[58]

As with the freight rate bureaus, we do not believe that antitrust immunity for the bus industry furthers sound transportation policy. We find unpersuasive NBTA's argument that immunity is necessary to allow small bus operators to compete with other available modes of transportation.[59] Cost efficiencies obtained through collective action are not appropriate if they harm consumers through their potential to increase charges or reduce competition for flexible travel rules.

NBTA members establish their passenger fares individually, and we see no reason why they should not also establish their baggage and express charges likewise. Although we have not received the same degree of interest with regard to bus immunity as we have regarding immunity for general freight carriers - which is not surprising given the difference between the typical bus user and the typical business using trucking services - there is no more reason to believe that bus package rates ought to be collectively set with antitrust immunity than freight rates for other types of motor carriers. We note that carriers in the airline industry set baggage charges, size limitations, and package rates individually without any apparent adverse effects on the public.

With respect to rules, those that are benign competitively do not need antitrust immunity and those that are not benign should not have such immunity. For example, rules that preclude competition on particular service terms could be struck down summarily if they were challenged on antitrust grounds. On the other hand, rules that clearly facilitate interchange without affecting rates and services would not raise antitrust issues. We need not, and will not, attempt to categorize all of NBTA's rules according to the degree to which they facilitate interchange and the degree to which they raise antitrust issues. Given deregulation, there is no public policy reason why any conduct by bus companies that would otherwise violate the antitrust laws should be immunized from those laws.

Accordingly, even though no party has specifically requested termination of our approval of NBTA's agreement, we believe this action is necessary to protect the public's interest in competition for favorable terms and conditions for bus transportation.

---

[58] Application of the National Bus Traffic Association Inc., for Extended Approval of its Conformed Agreement, Section 5a Application No. 9 (Amendment No. 8), slip op. at 2 (STB served May 24, 2002).

[59] See NBTA Comments filed May 24, 2005, in STB Ex Parte No. 656 at 1. NBTA's comments requesting renewal were filed late, accompanied by a motion to file out of time. The motion is granted.

STB Ex Parte No. 656, et al.

Household Goods

The collective activity of household goods carriers also differs from that of motor freight carriers. The Household Goods Carriers' Bureau Committee (HGCBC) collectively considers both classifications and rates and does not separate classification from rates.[60] HGCBC publishes different tariffs for different categories of shipments and shippers, including shipments of certain categories of goods other than the personal effects of households even though only personal effects and property to be used in a dwelling are now subject to regulation by the Board.[61] As with motor carriage of other forms of less-than-truckload (LTL) freight, shippers using HGCBC carriers generally receive discounts off the collectively set rates.

The potential for the market to set more competitive rates is as great or greater for household goods as for general freight. There are a large number of household goods carriers – HGCBC alone had 1,988 signatories to its agreement in 2005 and the competition is intense enough to force carriers to discount their rates from the HGCBC-set bureau rates. Household goods carriage is likely to stay competitive, perhaps even more so than LTL freight carriage, because entry into household goods carriage requires less investment in terminals.[62] Because household goods carriage is structurally competitive, termination of our approval of collective ratemaking and consequent removal of antitrust immunity for household goods carriage should be just as beneficial for household goods shippers as for LTL freight shippers.

One significant difference between household goods carriage and freight carriage is that household goods carriers' rates remain subject to regulation, whether or not they are collectively established.[63] However, the typical householder is not in a position to mount a regulatory rate

---

[60] For background information on collective ratemaking by HGCBC, see its testimony filed April 24, 2000, in Section 5a Application No. 1 (Sub-No. 10), which HGCBC incorporated into its testimony in STB Ex Parte No. 656.

[61] HGCBC's agreement was originally approved when the statutory definition of "household goods" encompassed more than the personal effects of households. At that time, household goods shipments were commonly categorized and discussed in terms of three statutory categories or "provisos," only the first of which included the personal effects of households. Compare prior 49 U.S.C. 10102(11) (1994) with current 49 U.S.C. 13102(10).

[62] See HGCBC Comments, filed Apr. 24, 2000, in Section 5a Application No. 1 (Sub-No. 10), Statement of Joseph A. Habib, at 2-3.

[63] See 49 U.S.C. 13701(a)(1)(A) (a rate, classification, rule, or other practice related to transportation involving a movement of household goods must be reasonable). On behalf of its members HGCBC has sought and received Board approval of changes to its members' released rates program. See, e.g., Released Rates of Motor Common Carriers of Household Goods, 5 S.T.B. 1147 (2001). Our decision today does not foreclose household goods carriers from petitioning as a group to establish other methodological changes regarding their liability for household good shipments. See 49 U.S.C. 14706(f)(1); see also United Mineworkers v.

(continued...)

- 19 -

STB Ex Parte No. 656, et al.

challenge. Thus, our rate review authority does not provide a strong basis for continued approval of collective activities of household goods carriers that may deprive their customers of the benefits afforded by the antitrust laws. Removing the regulatory approval of collectively set benchmark rates will provide confidence that rates will be at market-set levels.

HGCBC argues that application of the antitrust laws to collective ratemaking by household goods carriers is not needed to protect disadvantaged shippers. An HGCBC witness conducted a study of discounts showing that the average of the discounts received by small (cash on delivery, or "C.O.D.") shippers (presumably the ones needing protection) is about the same as that of large "national account" shippers.[64] The witness attributes this outcome to individual consumers shopping around for bargains to minimize an expense that can be a large part of a householder's budget. It may also be due to the ability of younger householders or those with few belongings to resort to self-help (i.e., moving their furniture themselves).

While the class as a whole may not be disadvantaged, an average discount level can conceal a wide range of discounts within the average, with some receiving lower discounts and some receiving higher ones, and we see no reason why even a small number of disadvantaged household goods shippers should be relegated to a collectively set base rate that most shippers can avoid. Our termination of approval of the HGCBC agreement and resulting removal of antitrust immunity for setting rates will infuse more competition into the system and remove any potential for household goods carriers to use that system to charge artificially high rates.

Like the SMCRC witness,[65] the HGCBC witness admits that there are differences in discounts but attributes them to differences in the cost of service (smaller shipments, shorter distances, etc.). Our response to witness Habib is the same – if shippers are receiving discounts from the class rates because of differences in the cost of service, rather than because the class rates exceed competitive levels, it is evidence that the class rates are not properly designed to reflect cost differences. For example, the fact that one household goods shipment moves over a longer distance than another should already be reflected in the bureau-set rates, if they are properly designed to reflect the transportation characteristics of shipments of household goods

---

(…continued)
Pennington, 381 U.S. 657 (1965) (Joint efforts to petition the government do not violate the antitrust laws.)

[64] See HGCBC comments, filed on Apr. 24, 2000, in Section 5a Application No. 1 (Sub-No. 10), Statement of Joseph A. Habib, at 6-8; HGCBC Opening Comments, filed Mar. 2, 2005, in STB Ex Parte No. 656, at 11 (updating witness Habib's study).

[65] See supra note 52, and the accompanying text.

(weight, distance, etc.).[66] It is not in the public interest to protect a collective rate-setting system that does not reflect recognized cost factors.

We do not agree that a collective rate-setting system helps to protect consumers from "fly by night" carriers that might otherwise prey on unsophisticated householders. We appreciate the efforts made by the American Moving and Storage Association (of which HGCBC is a part) to self-police and protect consumers from the unscrupulous practices of rogue movers. But an unscrupulous carrier is not obliged to participate in the bureau-system and could thus avoid any consumer-protection oriented bureau requirements. It is true that many household goods shipments involve individuals who may not be as well-versed in the law of contracts or commercial transactions as the carriers. However, given the significant expense of moving, householders can more appropriately protect themselves by obtaining multiple quotes, checking references, and arming themselves with information from FMCSA, the offices of most state attorneys general, and local better business bureaus.

<u>Classification</u>

We are also terminating approval of the agreement of the NCC. Shipper advocacy groups have argued for years that the classification process is being used as an indirect form of collective ratemaking and is often manipulated to protect carrier revenues. Although we find only limited support for this contention in the record, we are concerned that the classification process not be abused once the immunized rate bureau system is dismantled. After more than 50 years of government approval of what otherwise would have been per se illegal price-fixing by the rate bureaus, it would be a natural and likely step for some carriers, perhaps unintentionally, to look for ways to use the classification process as a revenue protection device. Such a result would undo the deregulatory aims of today's decision and would perpetuate the prior harms to shippers. Thus, continued approval of NCC's agreement would be contrary to the public interest. Our action protects the shipping public's interest in competitively set rates and neutral classification ratings.

Abuse of the classification system would be very difficult for the Board to detect and police. There has been an upward trend in classification ratings in recent history, but it is virtually impossible to identify a single cause for the trend or to determine whether that cause is benign or not. Carriers could, under the present system, systematically and selectively seek ratings increases for those products where shippers have few transportation alternatives, without fear of the behavior being challenged as anticompetitive. It is difficult for the Board to detect this abuse without continual monitoring of the classification process, a function the Board is not well suited to perform.

---

[66] Bureau classifications and rates are not detailed enough to reflect all cost factors. For example, they do not reflect the presence or absence of urban congestion or traffic imbalances. Thus, back-haul shippers and shippers in less congested areas may pay lower rates that reflect the carriers' lower marginal cost of operating in those situations.

STB Ex Parte No. 656, et al.

The best way to ensure that such abuse of the classification process will not take place once the immunized rate bureau system is dismantled is to subject carriers involved in classification to the antitrust laws. DOJ has the infrastructure in place to monitor industries for anticompetitive conduct. And the threat of treble damages in civil suits brought by affected shippers would encourage carriers to carefully review the classification system with regard to its structure, conduct limitations, and potential for manipulation.

It is not our intent to discourage the classification process properly administered. We recognize that there are significant benefits associated with having a classification system.[67] Even the most vocal critics of NCC acknowledge that aspects of the classification system help simplify the process of quoting and negotiating rates.[68] To obtain a rate quote, shippers need only identify the commodity being shipped, the weight of the shipment, and where it is going. There is usually no need to discuss the density, stowability, handling, and liability characteristics of each individual shipment, as these factors are reflected in the rating assigned to each commodity.

Moreover, antitrust immunity is not necessary to create or maintain a classification system or systems. Classification essentially is a cost model, whereby shipment characteristics are identified and analyzed to determine the cost of hauling them. There are many industries that rely upon commercial entities to develop cost models to help determine the price that is charged for a particular service or product. Some of these cost models are based on actual cost data that are collected from industry participants through a third party and then appropriately aggregated for wider dissemination. Other cost models are based on estimated data from public sources. Still other models are proprietary systems developed and used by a single entity.

The vast majority of these cost models, even those that rely upon aggregated data collected from industry participants, exist without antitrust immunity. There is nothing about the motor carrier industry that requires that NCC's cost model, or any other competitive motor carrier cost model that is created, to operate outside of the antitrust laws. Rather, NCC and any competitors must ensure that its model complies with the antitrust laws' standards for, among other things, neutrality, aggregation and confidentiality.

---

[67] See the House Committee on Public Works and Transportation Report that accompanied the Motor Carrier Act of 1980, H.R. Rep. No. 96-1069, 96th Cong., 2d Sess. at 28:

> [T]he Committee is of the view that the commodity classification system currently in place is a useful tool for shippers, receivers and transporters of regulated freight [s]o all "know what they are talking about" thereby contributing to an efficient and economical transportation system.

[68] See DOJ Comments at 5. Also, NASSTRAC's comments indicate that the National Motor Freight Classification would remain useful to shippers even after Board approval of NCC's agreement is terminated.

- 22 -

If challenged under the antitrust laws, the classification system would be judged under the "rule of reason." Contrary to the per se standard that would apply to rate bureau activity, the rule of reason is a highly fact-specific analysis that looks to the positive and negative effects of any challenged activity.[69] Thus, an antitrust court would consider arguments regarding how classification is pro-competitive or efficiency-enhancing. In 1998, the Board opined that there was a "sufficient possibility" that NCC would risk antitrust liability if it continued its classification activities without immunity. See EC-MAC I at 5 n.15. However, DOJ's comments in the present record are reassuring that the classification process can be reformed to comply with the antitrust laws, and that DOJ is willing to assist in this regard. Thus, we believe that the risk of antitrust liability can be minimized through consultation with DOJ and reformation of the classification process as appropriate.

Alternative Reforms.

We do not believe that increased regulatory oversight would be effective in preventing abuses of the classification system. Some commenters have suggested that the Board should mandate shipper voting rights on NCC's board. It is not clear that we have the authority to mandate such a condition.[70] However, even if we do have that authority, such a condition would not be sufficient to solve the perceived problem of structural bias or ensure that the interests of all shippers were represented. Similarly, we have no confidence that adjustments to NCC's non-linear density scale would address the core problem of the shippers – structural and entrenched bias in a system governed by carriers and immunized from the antitrust laws. In any event, we cannot conclude from this record that the density scale is, standing alone, inappropriate.[71]

---

[69] See DOJ Comments at 5 ("Legality of the classification system would depend on all relevant circumstances, including the methods used for classification, the factors considered, the decisionmaking process, and whether immunity for collective ratemaking is renewed.")

[70] Section 13703(a)(1)-(2) only authorizes "carriers" to enter into these agreements and seek Board approval; there is no mention of shippers in that section. Cf. 49 U.S.C. 10706(a)(5)(A) (providing for agreements between rail carriers' shippers to discuss compensation for a rail carrier's use of shipper-supplied rolling stock). We interpret the words "other persons" in 13703(a)(6) as referring to non-parties to an agreement who might otherwise be exposed to antitrust liability due to collective ratemaking, such as the staffers who help to administer bureaus, the numerous carriers who participate in their tariffs but are not involved in their governance, and other firms (including carriers) that help to administer the system by providing data, studies, etc.

[71] Density is the weight of a commodity expressed in pounds per cubic foot. NCC's Density Guidelines are a scale of suggested class ratings for a range of shipment densities. Generally speaking, assuming all other transportation factors remain constant, as density rises, classification ratings decrease and vice versa. The ratings range from 500 (for a density of less than 1 pound per cubic foot) to 50 (for a density of 50 or more pounds per cubic foot). Under NCC's non-linear density scale, density changes at the lower end of the density scale affect

(continued...)

- 23 -

STB Ex Parte No. 656, et al.

Finally, it seems ill-advised to try to micro-manage the process solely to protect carriers in a largely deregulated industry from the antitrust laws that apply to other unregulated industries.

<u>Continued Approval of NCC's Agreement Does Not Further Transportation Policies.</u>

Our decision to terminate NCC's approval is consistent with the motor carrier transportation policy at 49 U.S.C. 13101. A motor carrier classification system that is completely subject to the forces of competition and the antitrust laws encourages sound economic conditions as well as the development of reasonable rates.[72] Our chief concern – that classification not be used to stifle competition among motor carriers following the demise of the rate bureau system – reflects a policy of deterring unfair competitive practices.[73] Termination of approval is consistent with our policy goal to meet the needs of shippers and other consumers of motor carrier services.[74] Moreover, to the extent our decision facilitates the entry of competitors to NCC that might devise different ways of determining the transportation characteristics of commodities, we believe it will increase the variety of pricing options available to both carriers and shippers.[75] In sum, our action today terminating NCC's approval is fully supported by the regulatory policy goals that Congress has instructed us to pursue.

Other Collective Bureau Activities.

The bureaus argue that they conduct other beneficial collective activities – including establishment of through rates, joint rates and divisions, and the publication of mileage guides – that they claim would be at risk without antitrust immunity. We agree that some of these activities may be useful, or at least benign and not contrary to the public interest. But to the extent those activities do not affect rates, services, or competition, they do not need antitrust immunity in order to be continued. If the bureaus are in doubt about the likelihood of exposure to antitrust liability for those activities, they may take advantage of the business review

---

(…continued)
classification ratings far more than those at the higher end of the scale. The shipper organizations contend that this approach penalizes shippers carrying light density items, and gives carriers a greater incentive to pursue upwards ratings adjustments than shippers have to pursue downward adjustments. NCC contends that the non-linear scale accurately reflects the impact of density changes on each end of the scale.

[72] <u>See</u> 49 U.S.C. 13101(a)(1)(C) and (D).

[73] 49 U.S.C. 13101(a)(1)(D).

[74] 49 U.S.C. 13101(a)(2)(C).

[75] 49 U.S.C. 13101(a)(2)(D).

- 24 -

STB Ex Parte No. 656, et al.

procedure administered by DOJ's Antitrust Division[76] or consult other advisors regarding the bounds of permissible activity for collaboration among competitors.

The bureaus argue that at least some risk of antitrust litigation would attach and that antitrust immunity should be retained to avoid chilling these beneficial activities. However, as one court has observed, "[i]t is not realistic to expect a flood of antitrust lawsuits attacking a substantially procompetitive agreement."[77] Thus, we believe that the risk of chilling beneficial activity is small, as long as the bureaus put safeguards in place to avoid improper collusion, an effort that is standard among other industry associations. Terminating antitrust immunity will remove the potential to use an otherwise beneficial or benign activity to facilitate collusion in the provision of rates and services.

NCC argues that trade associations in other industries have run afoul of the antitrust laws for engaging in activities related to the exchange of price-related information (including cost or profit data), development of terms or conditions of sale, methods of distribution, joint research, and product standards and certification programs.[78] However, these well-known risks are faced by trade associations in every other industry. The bureaus should be no more deterred from pursuing beneficial activity than these other associations. With guidance from antitrust counsel and possibly DOJ, the bureaus should be able to work out a procedure to gather "price-related information" in the form of historical information about actual market rates in a way that minimizes antitrust risks. The remaining activities cited by NCC are either rightfully disfavored under antitrust law because they relate to rates and services, or are not conducted by the bureaus.

Through Routes, Joint Rates, and Divisions.

The bureaus assert that small carriers need antitrust immunity in order to expand their service through interline arrangements with other carriers.[79] However, motor carriers can

---

[76] See DOJ's comments filed Dec. 2, 2005, in STB Ex Parte No. 656 (Sub-No. 1), at 6. See also DOJ/Federal Trade Commission "Antitrust Guidelines for Collaboration Among Competitors," available on the FTC's website (www.ftc.gov). While not a shield against antitrust litigation, a favorable business review letter from DOJ will afford significant guidance on permissible activity. Because the DOJ business review process can take some time to complete, interested bureaus may wish to file requests with DOJ as early as possible in the 120-day transition period provided in this decision.

[77] Republic Airlines, Inc. v. Civil Aeronautics Board, 756 F.2d 1304, 1317 (8th Cir. 1985).

[78] See Rebuttal Comments filed April 21, 2005, in STB Ex Parte No. 656, Rebuttal Statement of William W. Pugh, at 5-6.

[79] See, e.g., HGCBC Comments filed April 24, 2000, in Section 5a Application No. 1 (Sub-No. 10), which HGCBC incorporated into its testimony in STB Ex Parte No. 656.

- 25 -

efficiently establish through routes, joint rates, and divisions without antitrust immunity. The interchange of traffic is nothing more than a partnership or contractor/subcontractor arrangement, whereby the carrier contracting with the shipper arranges for another carrier to conduct part of the movement. In our economy, the lack of need for collective action is demonstrated every time a contractor contracts independently with a subcontractor. We see no reason why motor carriers have a special need for antitrust immunity in order to cooperate with other motor carriers for interlining purposes.[80]

The bureaus' argument does not distinguish between the economic terms of interchange (rates, divisions, services, territories, participants, etc.), which involve competition issues, and other terms of interchange that do not involve competitive concerns. While the negotiation of joint endeavors always involves some cost element, the economic terms of joint endeavors should be no more difficult to negotiate in the motor carrier industry than in any other industry, as long as the associated transaction costs can be kept to a minimum. The minimization of interchange transaction costs may require some standardization in other interchange terms or conventions, such as billing practices, contract formats, damage recovery procedures, and computer programs to discover and arrange for the terms of interchange. This type of standardization does not require antitrust immunity, however, because it does not affect price or service competition between the interchanging carriers.[81]

Mileage Guides.

Rate bureaus also publish mileage guides. Like standard ways of measuring time and temperature, standard mileage guides can facilitate operations and thereby reduce costs without affecting competition. There are minimal antitrust risks associated with the collective publication and adoption of mileage guides, and no party has argued to the contrary.

Rules.

The bureaus, particularly NCC, also establish a variety of rules that indirectly affect the provision of service. In the prior review cycle, NCC provided an abstract of its rules.[82] Some rules may lower the cost of service without affecting competition. However, like all industry associations, the bureaus must refrain from establishing rules that tend to standardize terms or

---

[80] As the Board observed in EC-MAC-I, 3 S.T.B. at 931 n.16, citing Petition to Delay Applic. of Direct Connector Requirement, 367 I.C.C. 886 (1983), aff'd sub nom. American Short Line R.R. Ass'n v. United States, 751 F.2d 107 (2d Cir. 1984), "procedures can be feasibly developed to permit 'direct connectors' to set joint rates without antitrust immunity."

[81] See DOJ's Comments filed Dec. 2, 2005, in STB Ex Parte No. 656 (Sub-No. 1), at 6-7.

[82] See NCC Comments, filed Jan. 29, 1995, in Section 5a Application No. 61, at 6-9.

STB Ex Parte No. 656, <u>et al.</u>

conditions on which carriers should be competing, or rules that hinder a particular carrier's ability to compete. Following this decision, it will be incumbent upon the bureaus to conduct a review of their rules to determine which can be retained, subject to the antitrust laws.

<u>Activities Outside Scope of Section 13703</u>.

This termination of approval of bureau agreements does not affect beneficial bureau activities that do not come within the scope of activities covered under 49 U.S.C. 13703. Our approval and the resulting antitrust immunity applied only to those activities that are specified in section 13703(a)(1)(A)-(G). While we will not attempt to specify those bureau activities that fall outside of the section, we recognize the probability that there are such activities.

<u>Section 5a Application No. 46 (Sub-No. 20)</u>

Our action terminating approval of all remaining motor carrier bureaus renders moot the applications of SMCRC and other bureaus for geographic expansion of their approved activities.

CONCLUSION

For the reasons given above, we find that termination of our approval of the 11 remaining bureau agreements is necessary to protect the public interest. The resulting removal of antitrust immunity should ensure a competitive motor carrier industry.

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

<u>It is ordered</u>:

1. The Board's approval of the agreements of the 11 extant motor carrier bureaus is terminated.

2. The applications for geographic expansion to nationwide authority in STB Section 5a Applications No. 46 (Sub-No. 20) (SMCRC), No. 34 (Amendment No. 8) (Middlewest Motor Freight Bureau, Inc.), No. 22 (Amendment No. 7) (Pacific Inland Tariff Bureau, Inc.), No. 60 (Amendment 10) (Rocky Mountain Motor Tariff Bureau, Inc.), and No. 25 (Amendment No. 8) (The New England Motor Rate Bureau, Inc.) are dismissed as moot.

STB Ex Parte No. 656, et al.

3.  This decision will be effective September 4, 2007.

By the Board, Chairman Nottingham, Vice Chairman Buttrey, and Commissioner Mulvey.

Vernon A. Williams
Secretary

STB Ex Parte No. 656, et al.

APPENDIX
THE PARTIES AND THEIR POSITIONS

I. STB Ex Parte No. 656

There were three rounds of comments in STB Ex Parte No. 656, all of which were received before the (Sub-No. 1) proceeding was commenced to separately consider NCC's agreement. The commenters' positions and arguments are summarized below.

Opening Comments. Eleven motor carrier bureaus submitted opening comments asking for renewal of their agreement approval: the ten collective ratemaking bureaus; and NCC (comment submitted jointly with its unregulated parent, the National Motor Freight Traffic Association, Inc.), which develops commodity classifications but does not set rates.

The bureaus' arguments can be summarized as follows:

• As a group, the bureaus argued that (1) Congress supports continued antitrust immunity; (2) the agreements currently in place should remain approved because the bureaus have fully complied with all conditions previously imposed in the public interest and nothing has changed in the short period since the Board's last approval; and (3) the bureaus facilitate interlining, uniform packaging, and efficient operations.

• The rate bureaus focused on arguing that: (a) collective "benchmark" rates facilitate price and service competition; (b) there is no reason to believe that the collectively set rates are unreasonably high; and (c) small and medium size carriers need collective ratemaking to develop rates and to compete against larger trucking firms. The SMCRC defended the accuracy of its costing procedures in motor carrier general rate increase dockets. HGCBC submitted data allegedly demonstrating that individual shippers do not receive smaller discounts from the class rates than government or large national account shippers.

• NCC focused on arguing that: (i) the collective classification system serves the useful function of grouping commodities according to their transportation characteristics and thereby preventing rate discrimination and internal cross-subsidies; (ii) Congress has recognized the value of the classification system; and (iii) to avoid the risk of antitrust prosecution, antitrust immunity is necessary for all NCC functions.

NCC was the only bureau that attracted individually focused opposition to its renewal. Numerous one-page comments opposing renewal of that bureau were posted on the Board's

- 29 -

STB Ex Parte No. 656, et al.

website.  Except for correspondence from several Members of Congress,[83] almost all of these comments were from entities connected with the business of providing lighting or lighting fixtures.  Most comments proposed that NCC's agreement be changed to give shippers an equal vote with carriers in approving classification changes if the collective establishment of classifications is to continue to receive antitrust immunity from the Board.

NASSTRAC/NITL filed a statement urging the Board to terminate antitrust immunity for all bureaus, including NCC.  NASSTRAC/NITL maintained that, under 49 U.S.C. 13703, there is no rebuttable presumption in favor of continued collective ratemaking.  Those organizations argued that collective ratemaking is contrary to the public interest on the grounds that it results in higher rates for shippers without alternatives and the alleged harm cannot feasibly be cured through rate regulation by the Board.  Alternately, those organizations urged the Board to impose conditions if the agency opts for renewal.  For the rate bureaus, NASSTRAC/NITL proposed the following conditions:  (1) adopt a rebuttable presumption that full undiscounted class rates are unreasonable; (2) make any automatic discounts mandatory minimum discounts; (3) prohibit increases in bureau class rates that increase member carriers' profits rather than cover cost increases; and (4) adopt procedures to increase transparency and shipper participation in rate bureau proceedings.

Concerning NCC, NASSTRAC/NITL maintained that, despite the reforms imposed by the Board during the prior review cycle, NCC's procedures continue to be biased toward increases in classification ratings.  Those organizations criticized an alleged tendency to wear shippers down by simultaneously proposing small increases in the classification ratings of many different goods.  To eliminate the alleged bias against shippers in the event that the Board opts to continue antitrust immunity for NCC, NASSTRAC/NITL proposed that the Board: (1) reconsider its recommendation, rejected in the prior review cycle, to allow shipper voting participation in NCC proceedings; (2) modify NCC's Density Guidelines[84] so as to eliminate an

---

[83]  Congressmen Harold Ford, Bart Gordon, Pete Sessions, and Jim Cooper, and Senator Kay Bailey Hutchison sent letters expressing views on the Board's consideration of continued antitrust immunity for NCC.

[84]  NCC's Density Guidelines are a scale of suggested class ratings for a range of shipment densities measured in pounds per cubic foot.  The ratings decrease from 500 for a density of less than 1 pound per cubic foot to 50 for a density of 50 or more pounds per cubic foot.  The Density Guidelines scale appears in:  (a) NASSTRAC/NITL's Comments filed March 2, 2005, at 15-16; and (b) NCC's statement of its Policies and Directives, which appears on its website at www.nmfta.org and in Appendix A of the statement of Freight Transportation Consultants Association, Inc., filed November 18, 2005, in the (Sub-No. 1) proceeding.  The guidelines are just the starting-point for an analysis that ends with the assignment of a final rating after factors other than density (stowability, etc.) are considered.

alleged tendency to penalize movements of light density products, such as light bulbs;[85] (3) take steps to ensure that shippers know the precise issues involved in classification proceedings and that the issues are kept as narrow as possible;[86] and (4) take whatever other steps may be necessary to further facilitate shipper participation.  As an alternative to shipper voting participation in NCC actions, NASSTRAC/NITL suggested formation under Board auspices of an advisory panel of shippers and carriers to consider additional reforms.

    Reply Comments.  On April 1, 2005, reply comments in support of renewal were filed by the Middlewest Motor Freight Bureau, Inc., NCC, Pacific Inland Tariff Bureau, Inc., Rocky Mountain Tariff Bureau, Inc.,[87] and SMCRC.  The bureaus' replies took issue with the arguments and recommendations advanced by NASSTRAC/NITL.  In response to the numerous comments from the lighting industry, NCC's reply defended its procedures for changing classifications and its controversial year 2004 increase in the classification ratings for lamps, lighting fixtures, and lighting parts.  NCC's reply included a study allegedly showing that class rating increases have not been more frequent than decreases.  NCC also replied that the nonlinear scale of its density guidelines is necessary to ensure that lighter density freight recovers a reasonable share of revenue needed.[88]

    Reply comments in opposition to the bureaus' arguments for continuation of antitrust immunity were filed on April 1, 2005, by DOT (participating for the first time in this proceeding) and by NASSTRAC/NITL.  DOT responded that:  (1) competition is inherently better for shippers and consumers than collective action; (2) antitrust immunity is not necessary to protect small and medium size trucking firms; and (3) antitrust immunity is not necessary to give carriers the benefits of joint line rates or standard freight classifications.  NASSTRAC/NITL's reply added a new proposal that bureaus be required to submit regular financial and membership reports to the Board to permit better monitoring of their activities.

---

    [85]  NASSTRAC/NITL maintain that the Density Guidelines reflect a "nonlinear" relationship between density and weight, whereby ratings rise more quickly as density falls than they fall as density rises.  According to those organizations, this gives carriers more of an incentive to seek reclassifications due to density decreases than shippers have to seek reclassifications due to density increases.

    [86]  To illustrate this concern, NASSTRAC/NITL use a hypothetical example of NCC staff commencing an inquiry as to the density of all pots, pans, and cookware from all manufacturers when the only issue raised by a shipper or a carrier is the density of 10-inch Revere frying pans.

    [87]  On the same day, EC-MAC Motor Carriers Service Association, Inc., filed a statement concurring in the views of Rocky Mountain Tariff Bureau, Inc.

    [88]  In his reply statement at 8-9, William G. Pugh asserts that light density commodities tend to exhaust available space in trucks before they reach their load weight limit and that class ratings must reflect this.

STB Ex Parte No. 656, et al.

Rebuttal Comments. On April 21, 2005, rebuttal comments were filed. Comments supporting renewal were filed by: HGCBC; Middlewest Motor Freight Bureau, Inc.; NCC; Pacific Inland Tariff Bureau, Inc.; Rocky Mountain Tariff Bureau, Inc.; and SMCRC. Comments opposing renewal, or, alternately, favoring conditions, were filed by: DOT; NASSTRAC/NITL; and Acuity Brands Lighting. NASSTRAC/NITL challenged NCC's study developed to show that class rating increases have not been more frequent than decreases, arguing that: (1) it failed to analyze dockets that involved both increases and decreases in classification ratings; and (2) it did not consider the last 5 years of NCC's operations.

### II.  STB Ex Parte No. 656 (Sub-No. 1)

There were two rounds of comments in STB Ex Parte No. 656 (Sub-No. 1). The parties' positions and major arguments are summarized below.

Opening Comments. Opening comments were submitted by: Acuity Brands Lighting; American Lighting Association; Bohman Industrial Traffic Consultants, Inc.; Congressman Nick J. Rahall, II; Freight Transportation Consultants Association, Inc.; Genlyte; Holtkoetter International, Inc.; NASSTRAC; National Confectioners Association; National Electrical Manufacturers Association; Pacific Coast Lighting; DOJ; and DOT. All of these comments opposed renewal of NCC's agreement, or supported renewal only with conditions, except for the supporting comments of Bohman Industrial Traffic Consultants, Inc., and Congressman Nick J. Rahall, II.

NCC's opponents continued to argue that NCC proceedings are biased against shippers, illustrating some of their arguments by discussing specific NCC dockets involving lighting products,[89] ceiling fans with and without lighting fixtures,[90] tobacco products,[91] and candy and gum.[92] One allegation was that upward bias in ratings is inevitable because NCC is controlled by carriers and carriers have no financial incentive to propose reclassifications that result in lower ratings. NASSTRAC renewed its argument that NCC's density guidelines are a source of bias against shippers and added an allegation that rated densities can be overstated when commodities of differing density are mixed and moved on the same pallet.[93] NASSTRAC also

---

[89] See the comments of:  Acuity Brands Lighting, American Lighting Association; Genlyte; Holtkoetter International, Inc.; National Electrical Manufacturers Association; and Pacific Coast Lighting.

[90] See NASSTRAC Comments.

[91] See Freight Transportation Consultants, Inc Comments.

[92] See National Confectioners Association Comments.

[93] NASSTRAC attributed this problem to an NCC rule supposedly requiring that, when different articles are combined or attached to each other for shipment, the charge reflect the class for the highest classed article of the combination. See NASSTRAC's comments, at 6.

renewed its argument that the scope of NCC proceedings can be unduly broad, supporting its position by pointing to a docket involving ceiling fans with lighting fixtures.[94]  Another complaint was that NCC wears down opponents by repeatedly bringing requests for increased ratings even though the transportation characteristics of the commodities at issue had allegedly not changed.

The Freight Transportation Consultants Association, Inc. (FTCA) focused on NCC's Value Guidelines.[95]  According to FTCA, the Value Guidelines are subject to misuse because they imply that classification ratings may be increased for shipment values that exceed a carrier's loss and damage limit.  FTCA noted that a liability limit of $25 per pound often applies.  FTCA pointed to two classification dockets where NCC was persuaded to disregard the class ratings in the Values Guidelines after shippers noted that carrier liability limitations would prevent shippers from recovering the shipment values corresponding to the ratings in the guidelines.

DOJ's comments recognized the usefulness of freight classification but oppose continued antitrust immunity for NCC.  According to DOJ, a classification system such as NCC's can provide useful information concerning the transportation characteristics of commodities and framework of reference that can simplify the process of quoting and negotiating rates.  After recognizing these benefits, DOJ stated that NCC should be subjected to the same antitrust scrutiny that applies to other industries adopting classification systems or standards.  DOJ noted that, if NCC were to seek greater certainty regarding potential liability, it can take advantage of the Antitrust Division's business review procedure.  DOJ refrained from commenting on the likely outcome of such a review, stating only that it "would depend on all relevant circumstances, including the methods used for classification, the factors considered, the decision-making process, and whether immunity for collective ratemaking is renewed [footnote omitted]."[96]

---

[94]  In that docket, a shipper asked NCC to create a new classification that would encompass shipments of ceiling fans with or without lighting fixtures and replace the existing classification encompassing ceiling fans alone.  NASSTRAC argues that the NCC's staff improperly sought a broad range of information about the density and other transportation characteristics of shipments of ceiling fans with and without lighting fixtures and that NCC should have ruled simply that "ceiling fans" includes shipments with or without lighting fixtures, without changing the existing ratings.

[95]  NCC's Value Guidelines present a scale of class ratings corresponding to a range of shipment values per pound.  The ratings range from 50 for a value/pound of $.99 to 500 for a value/pound of $122.02.  The Value Guidelines scale appears in NCC's statement of its Policies and Directives, which is reproduced in Appendix A of the statement of Freight Transportation Consultants Association, Inc., filed on November 18, 2005, and on NCC's website at www.nmfta.org.

[96]  DOJ Comments, at 5.

STB Ex Parte No. 656, et al.

To deal with the alleged problems discussed above, NCC's opponents, with NASSTRAC taking the lead, suggested reforms in the event that the Board opts to continue antitrust immunity, as follows: (1) grant voting rights to shippers; (2) create an advisory group of shippers and carriers to work out changes in NCC procedures and standards; (3) outsource classification to an academic institution; (4) eliminate the nonlinear density scale in NCC's Density Guidelines; (5) amend NCC's Value Guidelines to require that, in applying its Value Guidelines, NCC must adopt whatever liability limit that is found in the docket record to apply to the commodity at issue, rather than its market value (FTCA's proposal); (6) terminate rules that allegedly inflate the class rating when commodities of differing density are mixed and moved on the same pallet; (7) require NCC to make its enquiries as narrow as possible; and (8) require that carriers proposing a classification change make a prima facie case for change, with supporting, accessible documentation, before a proceeding is initiated and shippers are required to submit information.

NCC's Reply. On December 22, 2005, NCC filed its reply comments. NCC argued that neither its procedures nor the arbitration process favors the carriers. According to NCC, participation in its dockets is not difficult or expensive for shippers because they need only provide representative information concerning the recognized characteristics of their shipments and shippers are given ample opportunity to provide this information. NCC submitted comments from three shippers, an association of shippers, and two shipper consultants supporting NCC and the classification process. NCC opposes NASSTRAC's proposals to create an advisory group of shippers and carriers to work out changes in NCC procedures and standards, to outsource classification to an academic institution, and to grant voting rights to shippers.

NCC disputed assertions that NCC's dockets burden shippers by being unduly broad. NCC maintains that the classification process inevitably involves some complexity, in that: (1) classifications may not be created or changed without studying the transportation characteristics considered to be relevant by the Board; and (2) classifications cannot feasibly be created for single articles within a commodity group (for example, 10-inch Revere frying pans within a broader "pans" commodity group). NCC disputed NASSTRAC's assertion that it automatically requests information as to all transportation characteristics of all types of a commodity when only one transportation characteristic of a particular commodity is at issue and states that NASSTRAC provided no example where this has actually occurred.

NCC defended the nonlinear scale in its Density Guidelines against NASSTRAC's allegation that it biases NCC proceedings in favor of classification increases. According to NCC, the relationship between density and transportability is inherently nonlinear. NCC also argued that it is proper to have a density scale that allows carriers to maintain their revenues as the density of commodities decreases. NCC updated an analysis of classification actions undertaken during the prior review cycle to include information about year 2005.

- 34 -

NCC defended its Value Guidelines against FTCA's proposed amendment to keep them from being used to increase classification ratings when shipment values exceed a carrier's loss and damage limit. NCC maintained that shipper liability limitations in motor carrier ratemaking tariffs should have no relevance to the establishment of a proper classification, reasoning that (1) what really matters in commodity classification is the potential risk of loss from transportation of a commodity (without tariff limitations) and (2) market value per pound is a recognized factor to be considered in estimating such risk. NCC maintained that FTCA's proposal is unworkable because motor carrier loss and damage limits vary significantly from the $25 per pound claimed by FTCA to be typical.

NCC discussed each of the specific dockets cited by shipper interests as illustrating the need for reform. NCC argued that the Board's procedural guidelines were followed in each docket and that the complaining shippers have not pursued the available remedies of arbitration and Board review.[97] As to the controversial year 2004 lighting products docket, NCC argued that: (1) it had to rely on its own comprehensive "raw data" on the transportation characteristics of the shipments being studied because the industry did not submit raw data; (2) NCC was not obliged to show that the transportation characteristics of lighting products had changed; (3) the pre-existing classification did not reflect the wide range of densities for lamps and lighting fixtures; (4) NCC has adopted similar re-classifications to reflect wide density ranges in dockets involving other goods, one of which was upheld by the Board;[98] and (5) the new classification includes class reductions as well as increases and now allows shippers to obtain lower freight charges by "bumping."[99] Concerning the year 2005 docket involving ceiling fans with attached lights, NCC responded that the staff investigation did not encompass a change that was broader

---

[97] In particular, NCC stated (Comments, at 55):

Since the NCC's current Section 5a Agreement became effective, a total of 147 classification proposals have been considered and acted upon by the NCC and its Classification Panels. Arbitration was not sought in connection with any of these actions; not by NASSTRAC or anyone else [footnote omitted]. In fact, as already discussed herein, the lighting industry pointedly eschewed arbitration. And no one has challenged any classification action to the STB via protest or complaint.

[98] NCC cited Protest and Petition for Suspension and Investigation (National Motor Freight Classification), STB Docket No. ISM 35007 (STB served Jan. 20, 2000), at 2, a proceeding involving textiles.

[99] "Bumping" allows shippers to artificially add weight to a shipment to decrease its classification rating by increasing its density. Increased weight will ordinarily lead to a higher charge, if nothing else changes. However, if the shipment is on a class density borderline, the charge-increasing effect of the increased weight may be more than offset by the charge-decreasing effect of the decreased classification rating, and the final result may be a lower charge.

STB Ex Parte No. 656, et al.

than that sought by the carriers, that NCC staff worked closely with shippers, and that NCC twice voluntarily postponed a decision to allow analysis of data submitted by shippers.

Responding to the comments of DOJ, NCC noted that in 1980 DOJ advised the Motor Carrier Ratemaking Study Commission that freight classification would be vulnerable to antitrust attack absent immunity and cites an article from an American Bar Association publication in support of this position.

Supplemental Pleadings. On March 24, 2006, NCC, having been granted permission by the Board, filed Supplemental Reply Comments responding to a letter dated February 21, 2006, from five members of Congress urging the Board to terminate NCC's antitrust immunity.[100] NCC's reply focused on defending recent increases in the classification ratings of candy.[101]

III. Section 5a Application No. 46 (Sub-No. 20)

SMCRC filed initial and rebuttal statements in support of its request. Reply comments in opposition to SMCRC were filed by DOT, NITL, and two regional rate bureaus, Rocky Mountain Tariff Bureau, Inc. and EC-MAC Motor Carrier Service Association, Inc.

---

[100] The five members of Congress were: Representative Danny K. Davis, Representative Charles W. Dent, Representative Rahm Emanuel, Representative Paul E. Gillmor, and Representative Ralph M. Hall.

[101] The Board also received a letter from Representative Nick J. Rahall II, urging the Board to reach a decision and defending NCC's antitrust exemption.

STB Ex Parte No. 656, et al.

Two shipper organizations, The National Electrical Manufacturers Association and the National Small Shipments Traffic Conference, Inc., filed reply comments supporting SMCRC subject to conditions, as follows:  (1) collection of the full (undiscounted) SMCRC class rates would be presumptively unreasonable; (2) SMCRC must continue the 20% class rate reduction that the bureau adopted to address the Board's earlier expressed concerns over inflated collective rates and to increase this discount if other bureaus do not survive; (3) SMCRC must adopt procedures to increase the participation and rights of shippers in internal bureau proceedings (similar to the procedures that the Board forced on the National Classification Committee in another proceeding); (4) the Board would review SMCRC's agreement after 3 years, rather than the 5-year maximum period allowed by statute; (5) the Board would adopt reporting conditions (noted below[102]); and (6) the Board would take steps to help to ensure reasonable pricing of SMCRC's Czar-Lite service.

On October 27, 2004, the Board held an oral argument.  The transcript is available on the Board's web site at www.stb.dot.gov.

---

[102]  In addition to a fallback 3-year review, DOT would require SMCRC to report on the number of bureaus still existing, the number of its members, the range and weighted average of discounts offered by its members, and would allow others to respond to these reports.

- 37 -

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| BREWTON ENTERPRISES, INC. d/b/a LONGLEAF LIGHTER, 766 Industrial Park Drive, Brewton, Alabama 36426, on behalf of itself and all others similarly situated, | AAA COOPER TRANSPORTATION; ARKANSAS BEST CORPORATION; ABF FREIGHT SYSTEMS, INC.; AVERITT EXPRESS, INC.; CON-WAY FREIGHT, INC.; ESTES EXPRESS LINES, INC.; FEDEX CORPORATION; FEDEX FREIGHT CORPORATION; FEDEX NATIONAL LTL, INC.; JEVIC TRANSPORTATION, INC.; OLD DOMINION FREIGHT LINE, INC.; OVERNITE CORPORATION; ROADWAY EXPRESS, INC.; R+L CARRIERS, INC.; SAIA, INC.; SAIA MOTOR FREIGHT LINE, LLC; SOUTHEASTERN FREIGHT LINES, INC.; SUN CAPITAL PARTNERS IV, LLC; UNITED PARCEL SERVICE, INC.; WATKINS MOTOR LINES; YELLOW TRANSPORTATION, INC.; YRC REGIONAL TRANSPORTATION, INC.; and YRC WORLDWIDE, INC.. |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF     Brewton, AL<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>(IN U.S. PLAINTIFF CASES ONLY)    Dutchan, AL<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Tanya Chutkan<br>Boies Schiller & Flexner LLP<br>5301 Wisconsin Ave., N.W. #800<br>Washington DC, 20015<br>tel: 202.237.2727<br>fax: 202.237.6131<br>tchutkan@bsfllp.com | Richard J. Favretto<br>John Nadolenco<br>Mayer, Brown, Rowe & Maw LLP<br>1909 K St. N.W.<br>Washington DC, 20006-1101<br>rfavretto@mayerbrown.com |

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ● A. Antitrust | ○ B. Personal Injury/ Malpractice | ○ C. Administrative Agency Review | ○ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| [X] 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. General Civil (Other) | OR | ○ F. Pro Se General Civil |
|---|---|---|

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General** <br> ☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** <br> (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ **895 Freedom of Information Act** <br> ☐ **890 Other Statutory Actions** <br> (if Privacy Act) <br><br> *(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans** <br> (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act** <br> ☐ **720 Labor/Mgmt. Relations** <br> ☐ **730 Labor/Mgmt. Reporting & Disclosure Act** <br> ☐ **740 Labor Railway Act** <br> ☐ **790 Other Labor Litigation** <br> ☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)** <br> ☐ **443 Housing/Accommodations** <br> ☐ **444 Welfare** <br> ☐ **440 Other Civil Rights** <br> ☐ **445 American w/Disabilities-Employment** <br> ☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance** <br> ☐ **120 Marine** <br> ☐ **130 Miller Act** <br> ☐ **140 Negotiable Instrument** <br> ☐ **150 Recovery of Overpayment & Enforcement of Judgment** <br> ☐ **153 Recovery of Overpayment of Veteran's Benefits** <br> ☐ **160 Stockholder's Suits** <br> ☐ **190 Other Contracts** <br> ☐ **195 Contract Product Liability** <br> ☐ **196 Franchise** | ☐ **441 Civil Rights-Voting** <br> (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

for price fixing under Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. §1

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☒ ACTION UNDER F.R.C.P. 23    **DEMAND $** _____  Check YES only if demanded in complaint **JURY DEMAND:** YES ☒ NO ☐

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☒    NO ☐    If yes, please complete related case form.

DATE  10/25/07    SIGNATURE OF ATTORNEY OF RECORD  _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.